102 F.3d 390
 96 Cal. Daily Op. Serv. 8744, 96 Daily Journal
D.A.R. 14,455
Dollard McGANN; Barry A. Bragger; Peter Gershon; Steven
G. Cooperman, M.D.; William S. Atherton; Irving Scher;
Michael Patitucci, Jr.; J. Floyd Johnson; Schulman,
Rogers, Gandal, Pordy & Becker, et al., Plaintiffs-Appellants,
v.
ERNST & YOUNG, Defendant-Appellee.
 Nos. 95-55925.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Aug. 7, 1996.
Decided Sept. 9, 1996.
As Amended on Denial of Rehearing
and Rehearing En Banc Dec. 4, 1996.*
 
 Leonard B. Simon, Milberg, Weiss, Bershad, Hynes & Lerach, San Diego, CA, for plaintiffs-appellants.
 Miles N. Ruthberg, Latham & Watkins, Los Angeles, CA, for defendant-appellee.
 Richard H. Walker, Securities and Exchange Commission, Washington, DC, for amicus curiae.
 Appeal from the United States District Court for the Central District of California, Alicemarie H. Stotler, District Judge, Presiding. D.C. No. CV-93-00814-AHS.
 Before: FLETCHER and TASHIMA, Circuit Judges, and RESTANI,** Judge, United States Court of International Trade.
 FLETCHER, Circuit Judge:
 
 
 1
 Plaintiff securities investors appeal the grant of judgment on the pleadings for defendant Ernst & Young ("E&Y"), an independent accounting firm. Plaintiffs alleged that E&Y incurred primary liability under § 10(b) of the Securities Exchange Act of 1934 (the "Act") by preparing a fraudulent audit report that it knew would be included by its client in a Form 10-K. This case requires us to decide whether the Supreme Court's recent decision in Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994), overturned the traditional interpretation of § 10(b) first set forth in SEC v. Texas Gulf Sulphur Co., 401 F.2d 833 (2nd Cir.1968) (en banc), cert. denied sub nom. Coates v. SEC, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969). We have jurisdiction, 28 U.S.C. § 1291, and we reverse.
 
 I. FACTS AND PRIOR PROCEEDINGS
 
 2
 At all relevant times, E&Y was the outside auditor for the Community Psychiatric Centers ("CPC"), a publicly traded corporation. Plaintiffs alleged the following facts: E&Y issued a false and misleading audit opinion regarding CPC's financial statements for the fiscal year ending in November 1990. Specifically, E&Y failed to disclose the fact that CPC had a major accounts receivable problem. E&Y knew that CPC would include this audit opinion in its annual Form 10-K filed with the Securities and Exchange Commission ("SEC"). The suppression of this information caused the artificial inflation of the price of CPC's stock. In September and November 1991, when CPC announced a major drop in earnings due to $37 million in uncollectible debts, the value of CPC's stock declined precipitously.
 
 
 3
 In June 1993, plaintiffs filed this action against E&Y.[1] Plaintiffs are a class of persons who purchased CPC stock between the time of the publication of E&Y's audit opinion and the time of CPC's announcement regarding bad debts. Plaintiffs alleged that by producing a fraudulent audit report with the knowledge that its client would disseminate the statements therein to the securities market, E&Y committed fraudulent acts "in connection with" the trading of securities, 15 U.S.C. § 78j(b), and thus violated § 10(b). Plaintiffs claimed that E&Y was both a primary violator of § 10(b), and a secondary violator as a conspirator with and an aider and abettor to CPC.
 
 
 4
 In May 1995, the district court granted E&Y's motion for judgment on the pleadings. See Fed.R.Civ.P. 12(c). The court held that the Supreme Court's recent decision in Central Bank squarely rejected aider and abettor liability under § 10(b). The court also held that Central Bank implicitly rejected conspirator liability.[2] The plaintiffs appeal neither of these holdings.
 
 
 5
 The district court then dismissed the plaintiffs' primary liability claim, holding that an independent accounting firm does not act "in connection with" securities trading when it produces a fraudulent audit report that it knows its client will include in a Form 10-K. The court noted the contrary authority of the Second Circuit's Texas Gulf and the Ninth Circuit's Wessel v. Buhler, 437 F.2d 279 (9th Cir.1971), but concluded that the these decisions were inconsistent with Central Bank. Specifically, the court reasoned that while Central Bank rested on the text of § 10(b), Texas Gulf and Wessel improperly rested on underlying congressional goals. The plaintiffs appeal the district court's primary liability holding.
 
 II. DISCUSSION
 
 6
 This case presents two overlapping questions: First, did Central Bank undermine Texas Gulf and its progeny? Second, is an accounting firm subject to primary liability under § 10(b) when it prepares a fraudulent audit report that it knows its client will include in a Form 10-K? We answer the first question in the negative, and the second question in the affirmative.
 
 A. STANDARD OF REVIEW
 
 7
 We review de novo a judgment on the pleadings pursuant to Rule 12(c). Merchants Home Delivery Service, Inc. v. Hall & Co., 50 F.3d 1486, 1488 (9th Cir.) (citation omitted), cert. denied sub nom. Prometheus Funding Corp. v. Merchants Home Delivery Services, Inc., --- U.S. ----, 116 S.Ct. 418, 133 L.Ed.2d 335 (1995). A judgment on the pleadings is properly granted when, taking all allegations in the pleading as true, the moving party is entitled to judgment as a matter of law. Id. We also review questions of law de novo. Twenty-Three Nineteen Creekside, Inc. v. Commissioner, 59 F.3d 130, 131 (9th Cir.1995).
 
 B. THE TRADITIONAL VIEW: TEXAS GULF
 
 8
 The Securities Exchange Act of 1934 regulates the post-distribution trading of securities. See 15 U.S.C. § 78a et seq. The " 'fundamental purpose' " of the Act was " 'to substitute a philosophy of full disclosure for the philosophy of caveat emptor.' " Central Bank, 511 U.S. at ----, 114 S.Ct. at 1445 (quoting Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128, 151, 92 S.Ct. 1456, 1471, 31 L.Ed.2d 741 (1972)). Section 10(b) of the Act prohibits fraudulent activities "in connection with" the purchase or sale of securities,[3] as does SEC Rule 10b-5.[4]
 
 
 9
 In Texas Gulf, the Second Circuit held that false and misleading assertions are made "in connection with" securities trading "whenever [such] assertions are made ... in a manner reasonably calculated to influence the investing public...." 401 F.2d at 862. Specifically, the court held that company officers violated Rule 10b-5 by issuing a misleading press release regarding the company's successful oil exploration activities. The court further held that the prohibition of Rule 10b-5 applies whether or not "the makers of a misleading statement also participated in pertinent securities transactions in connection therewith...." Id. at 860. See also Heit v. Weitzen, 402 F.2d 909 (2nd Cir.1968) (applying Texas Gulf to fraudulent annual reports, "as well as documents filed by the individual defendants with the SEC"), cert. denied, 395 U.S. 903, 89 S.Ct. 1740, 23 L.Ed.2d 217 (1969).
 
 
 10
 The Ninth Circuit adopted the Second Circuit's formulation. In Wessel, the Ninth Circuit held that " 'Rule 10b-5 is violated whenever assertions are made ... in a manner reasonably calculated to influence the investing public....' " 437 F.2d at 282 (quoting Texas Gulf, 401 F.2d at 862). The court then held that an outside accountant does not violate this standard by preparing documents that were never publicly disseminated. Id. In SEC v. Rana Research, Inc., 8 F.3d 1358 (9th Cir.1993), the Ninth Circuit again relied on the Texas Gulf formulation, holding that a financial consultant violated Rule 10b-5 by issuing a misleading press release regarding the stock value of a publicly traded company. Id. at 1362.
 
 
 11
 Several other circuits have also adopted Texas Gulf 's interpretation of the "in connection with" language of § 10(b). Gottlieb v. Sandia American Corp., 452 F.2d 510, 516 (3rd Cir.), cert. denied sub nom. Wechsler v. Gottlieb, 404 U.S. 938, 92 S.Ct. 274, 30 L.Ed.2d 250 (1971); Akin v. Q-L Investments, Inc., 959 F.2d 521, 528 (5th Cir.1992); Mitchell v. Texas Gulf Sulphur Co., 446 F.2d 90, 100-01 (10th Cir.), cert. denied, 404 U.S. 1004, 92 S.Ct. 564, 30 L.Ed.2d 558 (1971); SEC v. Savoy Industries, Inc., 587 F.2d 1149, 1171 (D.C.Cir.1978), cert. denied sub nom. Zimmerman v. SEC, 440 U.S. 913, 99 S.Ct. 1227, 59 L.Ed.2d 462 (1979).
 
 
 12
 The Supreme Court has never squarely addressed the validity of the Texas Gulf test. See Superintendent of Ins. of the State of New York v. Bankers Life & Cas. Co., 404 U.S. 6, 12-13, 92 S.Ct. 165, 168-70, 30 L.Ed.2d 128 (1971) (describing the issue as whether deceptive practices "touch[ ]" the sale of securities). However, in a discussion of the materiality of merger discussions for the purposes of § 10(b), the Court favorably quoted Texas Gulf 's interpretation of the "in connection with" language. Basic Inc. v. Levinson, 485 U.S. 224, 235 n. 13, 108 S.Ct. 978, 985 n. 13, 99 L.Ed.2d 194 (1988).
 
 C. THE CONTINUED VITALITY OF TEXAS GULF
 
 13
 The district court held and the defendant argues on appeal that Central Bank fatally undermined Texas Gulf and its progeny. Specifically, it is claimed that while the former requires an analysis of the text and structure of § 10(b), the latter improperly rest exclusively on policy considerations. The defendants further argue that under a proper reading of "in connection with," only those who actually trade securities are subject to primary liability under § 10(b). Accountants who simply make misrepresentations that they know will be included in Forms 10-K would not be included.
 
 
 14
 These reports of Texas Gulf 's demise are greatly exaggerated. There is no tension between the holding of Central Bank and the holding of Texas Gulf: the former forbids § 10(b) actions against aiders and abettors, 511 U.S. at ----, 114 S.Ct. at 1455, while the latter allows § 10(b) actions against primary violators " 'whenever assertions are made ... in a manner reasonably calculated to influence the investing public....' " Wessel, 437 F.2d at 282 (quoting Texas Gulf, 401 F.2d at 862). Indeed, while Texas Gulf turned on the meaning of "in connection with," Central Bank turned instead on the fact that "the text of the 1934 Act does not itself reach those who aid and abet a § 10(b) violation." 511 U.S. at ----, 114 S.Ct. at 1448.
 
 
 15
 Nor does the analytic approach of Central Bank undermine Texas Gulf 's interpretation of the "in connection with" language of § 10(b).
 
 1. Textual Analysis
 
 16
 The Central Bank Court began with an analysis of the text of § 10(b). 511 U.S. at ---- - ----, 114 S.Ct. at 1445-48. See Federal Trade Comm'n v. Bunte Bros., Inc., 312 U.S. 349, 350, 61 S.Ct. 580, 581, 85 L.Ed. 881 (1941) ("While one may not end with the words of a disputed statute, one certainly begins there.").
 
 
 17
 The relevant text of § 10(b) provides: "It shall be unlawful for any person ... [t]o use or employ, in connection with the purchase or sale of any security ..., any manipulative or deceptive device or contrivance...." 15 U.S.C. § 78j(b) (emphasis added). On its face, this language does not limit liability to those who actually trade securities. If Congress had meant to accomplish such a limitation, § 10(b) would provide: "It shall be unlawful for any person to purchase or sell any security by means of any manipulative or deceptive device or contrivance." Instead, § 10(b) extends liability to all those who use a fraudulent device "in connection with" the trading of securities.
 
 
 18
 It is equally clear that there must at least be some "connection" between the fraudulent acts and the trading of securities. Cf. 15 U.S.C. § 80b-6 (prohibiting fraud by investment advisors, regardless of whether or not related to securities trading). Thus, while § 10(b) defendants need not actually buy or sell securities, their fraudulent acts must have a "connection" to securities transactions. Texas Gulf strikes a reasonable balance, applying liability under § 10(b) to those who make public statements reasonably calculated to influence those who trade securities, whether or not such persons actually trade securities. 401 F.2d at 862.
 
 
 19
 E&Y makes two text-based counterarguments. First, E&Y argues that the "use or employ" language of § 10(b) limits liability to those who actually trade securities.[5] It is true that the words "use" and "employ" require some positive action. However, defendants take positive action when they make false statements that they know will reach potential investors, whether or not they also trade securities. See Anixter v. Home-Stake Prod. Co., 77 F.3d 1215, 1226 (10th Cir.1996) ("Reading the language of § 10(b) and 10b-5 through the lens of Central Bank of Denver, we conclude that in order for accountants to 'use or employ' a 'deception' actionable under antifraud law, they must themselves make a false or misleading statement (or omission) that they know or should know will reach potential investors.").
 
 
 20
 Second, E&Y argues that the use of "the" as opposed to "a" or "any" in the phrase "the purchase or sale of any security" also limits liability to those who participate in a particular securities transaction.[6] It is true that the word "the" implies a particularity lacking in the words "a" or "any." However, it does not follow that the defendant's fraud must be connected to a particular securities transaction engaged in by the defendant. This is especially true in light of Congress's insertion of the "in connection with" language.
 
 2. Structural Analysis
 
 21
 The Central Bank Court explained that while the text of the statute resolved the case, a structural analysis would lead to the same result. 511 U.S. at ----, 114 S.Ct. at 1448. See United States Nat'l Bank of Oregon v. Independent Ins. Agents of America, Inc., 508 U.S. 439, 455, 113 S.Ct. 2173, 2182, 124 L.Ed.2d 402 (1993) ("Statutory construction 'is a holistic endeavor,' United Savings Ass'n of Texas v. Timbers of Inwood Forest Associates, Ltd., 484 U.S. 365, 371, 108 S.Ct. 626, 630, 98 L.Ed.2d 740 (1988), and, at a minimum, must account for a statute's full text, language as well as punctuation, structure, and subject matter.").
 
 
 22
 Here, a structural analysis indicates that securities trading by the defendant is not a prerequisite to liability under § 10(b). At least three securities laws impose liability only where the fraud is part of a securities transaction: § 12(2) of the Securities Act of 1933, 15 U.S.C. § 77l(a)(2) (imposing liability on any person who "offers or sells a security" by the use of fraud); § 17(a) of the 1933 Act, 15 U.S.C. § 77q(a) (making it unlawful for any person "in the offer or sale of any securities" to use fraud); and the amended version of § 15 of the 1934 Act, 15 U.S.C. § 78o(c)(1)(A) ("No broker or dealer shall ... effect any transaction in, or ... induce or attempt to induce the purchase or sale of, any security" by the use of fraud). In the words of Texas Gulf, these laws demonstrate that "when Congress intended that there be a participation in a securities transaction as a prerequisite of a violation, it knew how to make that intention clear." 401 F.2d at 860. Thus, it would ignore the structure of the federal securities laws to read an implied trading requirement into the text of § 10(b).
 
 
 23
 E&Y makes three structure-based counterarguments. First, E&Y argues that the trading requirement of § 10(a) ought to be read into § 10(b). Section 10(a) prohibits unlawful "short sales" and "stop-loss orders" made "in connection with" securities trading.[7] Obviously, only a defendant who trades securities can be held liable under § 10(a). This, however, is the result of the specific "short sale" and "stop-loss order" requirements of § 10(a), and has nothing to do with the "in connection with" language.
 
 
 24
 Second, E&Y argues that § 10(b) is a catch-all for §§ 9 and 10(a), and that § 10(b) should therefore by limited by the trading requirement of §§ 9 and 10(a).[8] Both steps of this argument lack merit. The legislative history does indicate that § 10(b) is a catch-all clause. For example, Thomas G. Corcoran, a spokesperson for the Roosevelt Administration, described § 10(b) as a "catch-all" that was necessary "to deal with new manipulative devices." Texas Gulf, 401 F.2d at 859 (quoting Stock Exchange Regulation, Hearings before the House Committee on Interstate and Foreign Commerce, 73rd Cong., 2d Sess. 115 (1934)). However, it is not clear that § 10(b) is a catch-all for §§ 9 and 10(a) only. Moreover, the fact that §§ 9 and 10(a) both have a trading requirement, 15 U.S.C. §§ 78i, 78j(a), does not necessarily mean that § 10(b) is also so limited. Indeed, the fact that Congress specifically limited §§ 9 and 10(a) to defendants who engaged in securities transactions, but did not so limit § 10(b), is further evidence that reading an implied trading requirement into § 10(b) would be improper.
 
 
 25
 Third, E&Y argues that Texas Gulf 's interpretation of § 10(b) improperly turns § 18 into surplusage. Section 18 makes any party filing false or misleading statements with the SEC liable to any party damaged by reliance on such statements.[9] It is true that under Texas Gulf, many who damage securities traders by filing false statements with the SEC are liable under both § 10(b) and § 18. However, even under Texas Gulf 's interpretation of § 10(b), each of these two sections fills a unique niche: on the one hand, § 18 requires proof of reliance while § 10(b) presumes it; on the other hand, § 10(b) requires proof of scienter while § 18 does not. See Wachovia Bank & Trust Co., N.A. v. National Student Marketing Corp., 650 F.2d 342, 357 (D.C.Cir.1980) (discussing the differences between § 10(b) and § 18), cert. denied sub nom. White & Case v. Wachovia Bank & Trust Co., N.A., 452 U.S. 954, 101 S.Ct. 3098, 69 L.Ed.2d 965 (1981); Ross v. A.H. Robins Co., 607 F.2d 545, 555-56 (2nd Cir.1979) (same), cert. denied, 446 U.S. 946, 100 S.Ct. 2175, 64 L.Ed.2d 802 (1980). A defendant has available to it an affirmative defense that it acted in good faith and had no knowledge that its statement was false or misleading. Musick, Peeler and Garrett v. Employers Ins. of Wausau, 508 U.S. 286, 296, 113 S.Ct. 2085, 2090, 124 L.Ed.2d 194 (1993), (noting § 18 involves defendants who violated securities law with scienter, citing to Ernst & Ernst v. Hochfelder, 425 U.S. 185, 209, n. 28, 96 S.Ct. 1375, 1388, n. 28, 47 L.Ed.2d 668 (1975)). Thus, there is no surplusage problem in extending liability under § 10(b) beyond those who actually trade securities to include those who know their fraudulent activities will affect the market.
 
 3. Policy Analysis
 
 26
 The Central Bank Court concluded by rejecting various policy-based arguments raised by the plaintiffs as inconsistent with the Court's textual and structural analysis. 511 U.S. at ---- - ----, 114 S.Ct. at 1450-55. The Court noted the traditional rule that policy considerations "override" the text and structure of a statute only where necessary to prevent "bizarre" results that Congress obviously did not intend. Id. at ---- - ----, 114 S.Ct. at 1453-54 (citations omitted). This reasoning is fully consistent with the general rule that " 'it is proper for a court to consider ... policy considerations in construing terms in [the federal securities] Acts.' " Pinter v. Dahl, 486 U.S. 622, 653, 108 S.Ct. 2063, 2081, 100 L.Ed.2d 658 (1988) (quoting Landreth Timber Co. v. Landreth, 471 U.S. 681, 695 n. 7, 105 S.Ct. 2297, 2306 n. 7, 85 L.Ed.2d 692 (1985)) (bracket added in Pinter ). See also Independent Insurance, 508 U.S. at 455, 113 S.Ct. at 2182 (" '[I]n expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy.' ") (quoting United States v. Heirs of Boisdore, 49 U.S. (8 How.) 113, 122, 12 L.Ed. 1009 (1849)) (emphasis added).
 
 
 27
 Congress had "broad remedial goals" when it enacted the depression-era securities laws. Pinter, 486 U.S. at 653, 108 S.Ct. at 2081 (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 200, 96 S.Ct. 1375, 1384, 47 L.Ed.2d 668 (1976)). The Supreme Court has described these goals as follows:
 
 
 28
 The 1934 Act was designed to protect investors against manipulation of stock prices. See S.Rep. No. 792, 73d Cong., 2d Sess., 1-5 (1934). Underlying the adoption of extensive disclosure requirements was a legislative philosophy: "There cannot be honest markets without honest publicity. Manipulation and dishonest practices of the market place thrive upon mystery and secrecy." H.R.Rep. No. 1383, 73d Cong., 2d Sess., 11 (1934). This Court "repeatedly has described the 'fundamental purpose' of the Act as implementing a 'philosophy of full disclosure.' " Santa Fe Industries, Inc. v. Green, 430 U.S. 462, 477-78, 97 S.Ct. 1292 [1303], 51 L.Ed.2d 480 (1977), quoting SEC v. Capital Gains Research Bureau, Inc., 375 U.S. 180, 186, 84 S.Ct. 275 , 11 L.Ed.2d 237 (1963).
 
 
 29
 Basic, 485 U.S. at 230, 108 S.Ct. at 982-83. The traders-only rule proposed by E&Y is inconsistent with these goals. It would exempt from the remedial breadth of § 10(b) a broad range of misinformation and market manipulation, so long as the perpetrators did not buy or sell securities in connection therewith. Yet a party that introduces fraudulent information into the securities market does no less damage to the public because that party did not trade stocks. Congress's goals are better served by giving the "in connection with" language of § 10(b) its natural meaning and imposing liability on all whose false assertions are reasonably calculated to influence the investing public.
 
 4. Summary
 
 30
 The holding of Texas Gulf rests soundly upon a textual analysis of § 10(b), a structural analysis of the surrounding securities laws, and a policy analysis of Congress's remedial goals. Accordingly, the methodology of Central Bank does not undermine the holding of Texas Gulf. See Adam v. Silicon Valley Bancshares, 884 F.Supp. 1398, 1402 (N.D.Cal.1995) ("The court is not persuaded that an abandonment of the Wessel/Rana Research construction of the 'in connection with' requirement is justified by the holding of Central Bank."); In re Leslie Fay Companies, Inc., 871 F.Supp. 686, 694-97 (S.D.N.Y.1995) (holding that Central Bank did not overturn the traditional interpretation of "in connection with"); Spear v. Ernst & Young, Fed. Sec. L. Rep. (CCH) p 98,399 at p. 90,744, 1994 WL 585815 (D.S.C.1994) ("[T]he court rejects defendants' argument that Central Bank represents a radical departure from established precedent regarding the exposure of auditors under Section 10(b)."), rev'd on other grounds sub nom. In re Policy Management Systems Corp., 1995 WL 541623 (4th Cir. Sept. 13, 1995). See also Itoba Ltd. v. Lep Group PLC, 54 F.3d 118, 123 (2nd Cir.1995) (following Texas Gulf in the post-Central Bank era), cert. denied sub nom. Berkley v. Itoba Ltd., --- U.S. ----, 116 S.Ct. 702, 133 L.Ed.2d 659 (1996).
 
 
 31
 D. APPLICATION OF TEXAS GULF TO THE INSTANT FACTS
 
 
 32
 Under Texas Gulf and Wessel, plaintiffs' claim survives a motion for judgment on the pleadings. Plaintiffs allege that E&Y produced a fraudulent audit report for CPC, knowing that CPC would include this report in its Form 10-K filed with the SEC. If true, E&Y made false assertions " 'in a manner reasonably calculated to influence the investing public,' " Wessel, 437 F.2d at 282 (quoting Texas Gulf, 401 F.2d at 862), and thus "in connection with" securities trading in violation of Section 10(b) and Rule 10b-5. See In re Leslie Fay Companies, Inc., 871 F.Supp. 686, 688, 695 (S.D.N.Y.1995) (refusing to dismiss § 10(b) action against accounting firm that allegedly produced fraudulent audit reports that it knew would be included in its client's Form 10-K).
 
 
 33
 The fact that E&Y is an outside accounting firm does not foreclose liability under § 10(b). As Central Bank explained, "[a]ny person or entity, including a lawyer, accountant, or bank ... may be liable as a primary violator under 10b-5...." 511 U.S. at ----, 114 S.Ct. at 1455 (emphasis added). In Herman & MacLean v. Huddleston, 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983), the Supreme Court upheld a verdict imposing direct § 10(b) liability on "the accounting firm, Herman & MacLean, which had issued an opinion concerning certain financial statements and a pro forma balance sheet that were contained in the registration statement and prospectus." Id. at 378, 103 S.Ct. at 685 (footnote omitted). See also Knapp v. Ernst & Whinney, 90 F.3d 1431 (9th Cir.1996) (upholding § 10(b) liability for an outside accounting firm based on its audit report); Anixter v. Home-Stake Production Co., 77 F.3d 1215, 1227 (10th Cir.1996) (upholding § 10(b) liability for an outside accounting firm that knew its false audit opinions would reach the investing public). While an outside accounting firm might be blameless where it had no reason to know that its client would use its audit report to sell securities, or where it instructed its client not to release the report to the public, Frymire-Brinati v. KPMG Peat Marwick, 2 F.3d 183, 189-90 (7th Cir.1993), the instant plaintiffs squarely alleged that E&Y knew that CPC would include its audit opinion in a Form 10-K.
 
 
 34
 Nor is E&Y protected by the fact that this case involves the dissemination of false information to the investing public by way of an independent audit report contained in a Form 10-K. These forms must be filed with the SEC on an annual basis. See 15 U.S.C. § 78m; 17 C.F.R. § 249.310. The stock price of publicly traded companies reflects information contained in Forms 10-K. As the Supreme Court has explained, "[c]orporate financial statements [including Form 10-Ks] are one of the primary sources of information available to guide the decisions of the investing public." United States v. Arthur Young & Co., 465 U.S. 805, 810 & 811 n. 5, 104 S.Ct. 1495, 1499 & 1499 n. 5, 79 L.Ed.2d 826 (1984). Indeed, federal reporting requirements, such as the Form 10-K, exist "to control the accuracy of the financial data available to investors in the securities markets...." Id. at 810-11, 104 S.Ct. at 1499. Fraudulent Forms 10-K thus fall within the ambit of § 10(b). See Rana, 8 F.3d at 1358 (liability under § 10(b) extends to "a document such as a press release, annual report, investment prospectus or other such document on which an investor would presumably rely").
 
 III. CONCLUSION
 
 35
 Because an accounting firm acts "in connection with" securities trading when it produces an audit report that it knows its client will include in a Form 10-K, and because Central Bank did not overturn this traditional understanding of direct liability under § 10(b), we REVERSE the district court's grant of judgment on the pleadings for E&Y.
 
 
 36
 REVERSED AND REMANDED.
 
 
 
 *
 Judges Fletcher and Tashima have voted to deny the suggestion for rehearing en banc and Judge Restani so recommends
 
 
 **
 Honorable Jane A. Restani, Judge of the United States Court of International Trade, sitting by designation
 
 
 [1]
 Plaintiffs' separate action against CPC, McGann v. Community Psychiatric Centers, D.C. No. CV-91-533, has settled
 
 
 [2]
 The Ninth Circuit subsequently held that the rationale of Central Bank "precludes a private right of action [under § 10(b) ] for 'conspiracy' liability." In re GlenFed, Inc. Securities Litigation, 60 F.3d 591, 592 (9th Cir.1995)
 
 
 [3]
 Section 10(b) of the Act provides:
 It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange -
 (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors.
 15 U.S.C. § 78j (emphasis added).
 
 
 [4]
 SEC Rule 10b-5 provides:
 It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
 (a) To employ any device, scheme, or artifice to defraud,
 (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
 (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.
 
 
 [17]
 CFR § 240.10b-5 (1993) (emphasis added)
 
 
 [5]
 Section 10(b) provides: "It shall be unlawful for any person ... [t]o use or employ, in connection with the purchase or sale of any security ..., any manipulative or deceptive device or contrivance...." 15 U.S.C. § 78j(b) (emphasis added)
 
 
 [6]
 Section 10(b) provides: "It shall be unlawful for any person ... [t]o use or employ, in connection with the purchase or sale of any security ..., any manipulative or deceptive device or contrivance...." 15 U.S.C. § 78j(b) (emphasis added)
 
 
 [7]
 Section 10(a) makes it unlawful "[t]o effect a short sale, or to use or employ any stop-loss order in connection with the purchase or sale of any security" in violation of any SEC rules. 15 U.S.C. § 78j(a)
 
 
 [8]
 Section 9 prohibits various means of manipulating securities prices. 15 U.S.C. § 78i
 
 
 [9]
 Under § 18,
 Any persons who shall make or cause to be made any statement in any application, report, or document filed pursuant to this chapter ... which statement was ... false or misleading with respect to any material fact, shall be liable to any person ... who, in reliance upon such statement, shall have purchased or sold a security at a price which was affected by such statement....
 15 U.S.C. § 78r(a).