FOR PUBLICATION

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

SUSHOVAN TAREQUE HUSSAIN,
*Defendant-Appellant.*

No. 19-10168

D.C. No.
3:16-cr-00462-CRB-1

OPINION

Appeal from the United States District Court
for the Northern District of California
Charles R. Breyer, District Judge, Presiding

Argued and Submitted May 11, 2020
San Francisco, California

Filed August 26, 2020

Before:  Ryan D. Nelson and Daniel A. Bress, Circuit
Judges, and James S. Gwin,* District Judge.

Opinion by Judge Bress

---

*The Honorable James S. Gwin, United States District Judge for the Northern District of Ohio, sitting by designation.

## SUMMARY[**]

### Criminal Law

The panel affirmed Sushovan Hussain's convictions and sentence for wire fraud, conspiracy to commit wire fraud, and securities fraud in a case in which Hussain—who served as Chief Financial Officer of Autonomy Corporation, a U.K. technology company that Hewlett-Packard acquired in 2011—and others fraudulently inflated revenue through a series of elaborate accounting schemes.

The panel held that Hussain's wire fraud convictions did not involve an impermissible extraterritorial application of United States law to foreign conduct because the "focus" of the wire fraud statute is the use of the wires in furtherance of a scheme to defraud, and Hussain used domestic wires to perpetrate his fraud. The panel also held that sufficient evidence supported Hussain's conviction for securities fraud because a reasonable jury could conclude that Hussain's approval of false and misleading financial information in an HP press release distributed to the investing public reflected a fraudulent scheme "in connection with" U.S. securities.

In a concurrently filed memorandum disposition, the panel held that the district court did not abuse its discretion in certain evidentiary rulings or err in ordering money forfeiture.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

Alexandra A.E. Shapiro (argued) and Lauren M. Capaccio, Shapiro Arato Bach LLP, New York, New York, for Defendant-Appellant.

Robert S. Leach (argued), Jonas Lerman, Adam A. Reeves, and William Frentzen, Assistant United States Attorneys; Merry Jean Chan, Chief, Appellate Section; Hallie Hoffman, Chief, Criminal Division; David L. Anderson, United States Attorney; United States Attorney's Office, San Francisco, California; for Plaintiff-Appellee.

**OPINION**

BRESS, Circuit Judge:

Sushovan Hussain served as Chief Financial Officer of Autonomy Corporation, a U.K. technology company that Hewlett-Packard (HP) acquired in 2011. Following the acquisition, HP discovered that Hussain and others fraudulently inflated Autonomy's revenue through a series of elaborate accounting schemes. Hussain was charged with wire fraud, conspiracy to commit wire fraud, and securities fraud. After a lengthy jury trial, Hussain was convicted on all counts.

We hold that Hussain's wire fraud convictions did not involve an impermissible extraterritorial application of United States law to foreign conduct because the "focus" of the wire fraud statute is the use of the wires in furtherance of a scheme to defraud, and Hussain used domestic wires to perpetrate his fraud. We also hold that sufficient evidence supported Hussain's conviction for securities fraud because

a reasonable jury could conclude that Hussain's approval of false and misleading financial information in an HP press release distributed to the investing public reflected a fraudulent scheme "in connection with" U.S. securities.

In a concurrently filed memorandum disposition, we hold that the district court did not abuse its discretion in certain evidentiary rulings or err in ordering money forfeiture. We therefore affirm Hussain's convictions and sentence in full.

I

Autonomy was a U.K. technology company with dual headquarters in San Francisco and Cambridge, United Kingdom. Hussain, a U.K. citizen, served as Autonomy's CFO from approximately June 2001 to the spring of 2012. In this role, he was responsible for preparing Autonomy's financial reports and certifying that they complied with U.K. regulations for public companies.

HP began exploring the possibility of acquiring Autonomy in early 2011, negotiating the deal that summer. On August 18, 2011, HP announced that it would acquire Autonomy for more than $11 billion, or £25.50 per share, an approximately 64% premium on the market price for Autonomy's shares on the London Stock Exchange.

Post-acquisition, things quickly soured. After Hussain left the company in May 2012, Autonomy's new CFO discovered errors in Autonomy's publicly filed financial documents and decided to restate the company's finances for 2010. Upon closer review, it was revealed that for years Hussain and others at Autonomy had fraudulently represented the company's financial picture.

Hussain and his co-conspirators perpetrated this fraud through various sophisticated tactics. Each was centered around the idea of inflating Autonomy's revenue, one of the main metrics of success for a technology company because it signals growth and creates strong market valuation—thereby making Autonomy an attractive acquisition target.

The government's evidence at trial was extensive and we offer only a flavor of it here. Among other things, Autonomy recorded revenue earlier than allowed under standard accounting practices by paying intermediary brokers to buy its software, even though the brokers often had no intention of selling it to end-users. Autonomy backdated some of these deals so that it could increase revenue for certain past quarters. In addition, and despite representing itself as a "pure software" company, Autonomy sold hardware at a loss to further inflate its revenues. Extensive evidence presented at trial showed that Hussain was centrally involved in both inflating Autonomy's revenue and misrepresenting its claimed financial success to HP.

The government's evidence at trial showed that Hussain and Autonomy had substantial presence in the United States before and during the negotiations for the HP deal. As relevant here, during the course of HP's due diligence leading up to the Autonomy acquisition, Hussain and his co-conspirators used emails, press releases, and video and telephone conference calls to speak with HP executives in the United States and fraudulently misrepresent Autonomy's finances. On the cusp of finalizing the HP deal, Hussain signed a letter warranting that an HP press release announcing the acquisition contained truthful financial information about Autonomy, when it did not. When the deal closed, Hussain earned approximately $16 million.

Following a joint investigation by American and U.K. authorities, Hussain was charged in the Northern District of California with fourteen counts of wire fraud under 18 U.S.C. § 1343, and one count of conspiracy to commit wire fraud under 18 U.S.C. § 1349. Each count of wire fraud alleged the misuse of a wire with a connection to the Northern District. A few months later, the government superseded the indictment and added one count of securities fraud under 18 U.S.C. § 1348. The government's theory for this charge was that Hussain engaged in a scheme to defraud "in connection with" HP securities by "caus[ing] HP to issue a press release to the market that was false."

Hussain moved to dismiss the indictment, arguing that his wire fraud charges were an impermissible extraterritorial application of U.S. law and that the securities fraud charge was too attenuated to U.S. securities. The district court rejected these legal challenges. After a 29-day trial in which the government called 37 witnesses, the jury found Hussain guilty on all counts. Hussain was sentenced to 60 months' imprisonment. He was also ordered to pay a $4 million fine and $6.1 million in restitution. This appeal followed.

II

Hussain's primary argument on appeal is that his convictions for wire fraud and conspiracy to commit wire fraud must be reversed because they involved the improper application of U.S. criminal law to conduct abroad. We review questions of statutory interpretation de novo. *United States v. Gagarin*, 950 F.3d 596, 603 (9th Cir. 2020). In determining if the evidence was sufficient to sustain a conviction, we consider whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 602

(quotations omitted).  We hold that Hussain's wire fraud and conspiracy convictions are not impermissibly extraterritorial because they are based on conduct that occurred in the United States.[1]

## A

Federal criminal law generally applies to domestic conduct, so when foreign conduct is also involved, questions arise as to whether a U.S. prosecution exceeds its proper bounds.  Under the longstanding "presumption against extraterritoriality," the Supreme Court has held that "[a]bsent clearly expressed congressional intent to the contrary, federal laws will be construed to have only domestic application."  *RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct. 2090, 2100 (2016).  But if the object of a federal law is conduct that occurs in this country, the concerns associated with a potentially extraterritorial application of our laws do not come into play.  *Id.* at 2100–101.

In *Morrison v. National Australian Bank Ltd.*, 561 U.S. 247, 262–65 (2010), the Supreme Court devised a two-step framework for analyzing issues of extraterritoriality.  *See also RJR Nabisco*, 136 S. Ct. at 2101.  We first ask "whether the presumption against extraterritoriality has been rebutted—that is, whether the statute gives a clear, affirmative indication that it applies extraterritorially."  *Id.* If it does not, then we "determine whether the case involves

---

[1] We reject the government's assertion that Hussain failed to preserve this issue.  Hussain raised the objection in his pre-trial motion to dismiss and re-raised it in his Rule 29 motion for judgment of acquittal.

a domestic application of the statute" by "looking to the statute's 'focus.'" *Id*.

A statute's "focus" under step two of *Morrison* is "'the object of its solicitude,' which can include the conduct it 'seeks to regulate' as well as the parties and interests it 'seeks to protect' or vindicate." *WesternGeco LLC v. ION Geophysical Corp.*, 138 S. Ct. 2129, 2137 (2018) (quoting *Morrison*, 561 U.S. at 267) (alterations omitted). If a statute is not extraterritorial under *Morrison* step one, the question under step two becomes whether the conduct that is proscribed took place in this country to a sufficient extent:

> If the conduct relevant to the statute's focus occurred in the United States, then the case involves a permissible domestic application even if other conduct occurred abroad; but if the conduct relevant to the focus occurred in a foreign country, then the case involves an impermissible extraterritorial application regardless of any other conduct that occurred in U.S. territory.

*RJR Nabisco*, 136 S. Ct. at 2101.

The Supreme Court has instructed that "[b]ecause a finding of extraterritoriality at step one will obviate step two's 'focus' inquiry, it will usually be preferable for courts to proceed" with these two steps sequentially. *Id.* at 2101 n.5. But courts may also "start[] at step two in appropriate cases." *Id.* This is such a case because the focus of the wire fraud statute is the use of the wires in furtherance of a scheme to defraud, which here occurred domestically. We therefore need not and do not decide whether § 1343 applies extraterritorially.

B

The wire fraud statute states:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1343.  There are thus three elements of wire fraud: "(1) a scheme to defraud, (2) use of the wires in furtherance of the scheme and (3) a specific intent to deceive or defraud." *United States v. Garlick*, 240 F.3d 789, 792 (9th Cir. 2001).  Hussain and the government disagree over the "focus" of § 1343 under the *Morrison* framework outlined above.  Hussain argues that the "focus" is the first element— the "scheme to defraud"—whereas the government argues it is the "misuse of the wires."

Our circuit has yet to resolve this issue in a published opinion.  But the text of the statute and the precedents interpreting it provide a clear path to the answer.  Section 1343 is not a general fraud statute, but instead criminalizes frauds that specifically involve the misuse of the wires. *Pasquantino v. United States*, 544 U.S. 349, 358 (2005) ("[T]he wire fraud statute punishes fraudulent use of domestic wires.").  It reflects "the policy choice" to "free the interstate wires from fraudulent use, irrespective of the

object of the fraud." *Id.* at 370. As we have explained, the wire fraud statute "protect[s] the instrumentalities of communication, making the *use* of the . . . wires as part of a fraudulent scheme an independent offense quite separate from any other potentially illegal conduct." *Garlick*, 240 F.3d at 792; *see also id.* at 793 (wire fraud statute is "directed at the instrumentalities of fraud") (quotations omitted).

Our analysis in *Garlick* is particularly instructive here. In *Garlick*, we held that "each use of the wires constitutes a separate violation of the wire fraud statute." *Id.* We therefore affirmed the defendant's convictions for two counts of wire fraud under § 1343: one for faxing fraudulent information about the age of a product, and another for causing the buyer in return to fax his agreement to purchase the product. *Id.* at 790. It was no matter that both uses of the wires were part of the same overarching scheme to defraud. *Id.* at 794.

In reaching this conclusion, we drew on the similarly worded mail fraud statute, 18 U.S.C. § 1341, and—in language relevant here—noted that "[c]ourts have consistently construed Congress' intent behind the mail fraud statute broadly, focusing on the use of the mails itself, not on the underlying scheme or a particular fraud victim." *Garlick*, 240 F.3d at 792. In *Garlick*, we also agreed with the D.C. Circuit that "the focus of the mail and wire fraud statutes is upon the misuse of the instrumentality of communication." *Id.* at 792 (quoting *United States v. Alston*, 609 F.2d 531, 536 (D.C. Cir. 1979)) (alterations omitted).

Other circuits have specifically determined that under *Morrison* step two, the "focus" of the wire fraud statute is the misuse of the wires. In a recent decision, the First Circuit explained that "the structure, elements, and purpose of the

wire fraud statute indicate that its focus is not the fraud itself but the abuse of the instrumentality in furtherance of a fraud." *United States v. McLellan*, 959 F.3d 442, 469 (1st Cir. 2020). The First Circuit therefore affirmed the defendant's convictions under § 1343 because his "domestic conduct through domestic wires [ ] spurred his prosecution." *Id.* at 470. The Second Circuit also evaluated § 1343 under the *Morrison* framework and similarly concluded that "the regulated conduct is not merely a 'scheme to defraud,' but more precisely *the use of the . . . wires in furtherance of a scheme to defraud*." *Bascuñán v. Elsaca*, 927 F.3d 108, 122 (2d Cir. 2019); *see also United States v. Napout*, 963 F.3d 163, 179 (2d Cir. 2020) (same).[2]

Despite this ample precedent from our circuit and others, Hussain argues that the "focus" of § 1343 for *Morrison* purposes is the "scheme to defraud." We are aware of no court that has agreed with this interpretation, and Hussain does not identify any. Instead, Hussain argues we should be guided by language in several decisions, including from the Supreme Court, stating that the "gravamen" of the mail fraud statute (and by extension the wire fraud statute) is "the scheme to defraud." *Bridge v. Phx. Bond & Indem. Co.*,

---

[2] The Second Circuit in *Bascuñán* held that wire fraud "involves sufficient domestic conduct when (1) the defendant used domestic . . . wires in furtherance of a scheme to defraud; and (2) the use of the . . . wires was a core component of the scheme to defraud." 927 F.3d at 122. The First Circuit interpreted this second requirement as relevant where "a foreign defendant is alleged to have committed wire fraud against a foreign victim, and the use of domestic wires was merely 'incidental' to the overall scheme." *McLellan*, 959 F.3d at 470 n.7. That is not the case here because Hussain defrauded a domestic victim. In all events, under *Bascuñán* Hussain's conduct was sufficiently domestic because the use of wires to defraud HP was a core component of his fraud, and not "merely incidental." 927 F.3d at 122.

553 U.S. 639, 647 (2008). Hussain also points out that in distinguishing Securities Exchange Act § 10(b) from wire fraud, the Supreme Court noted that the wire fraud statute prohibits "'any scheme or artifice to defraud'—fraud *simpliciter*, without any requirement that it be 'in connection with' any particular transaction or event." *Morrison*, 561 U.S. at 271–72.

Hussain's reliance on these passages does not overcome the plain import of the statutory text and the body of precedent relevant to the extraterritoriality issue at hand. We understand the language in the cases upon which Hussain relies to mean simply that § 1343 criminalizes a broad array of fraudulent schemes, which is consistent with the notion that the "focus" of the statute for *Morrison* purposes is the instrumentalities used to perpetrate those schemes. Further, Hussain's argument is in serious tension with our decision in *Garlick*. That a defendant can commit multiple violations of § 1343 in service of one fraudulent plot suggests that the focus of the statute is not on the overall scheme. *See Garlick*, 240 F.3d at 792. Indeed, we said as much in *Garlick* itself. *Id.* at 792–93.

Equally unavailing is Hussain's argument that misuse of the wires is merely a jurisdictional element rather than a substantive element of the wire fraud offense. We have held that the "*interstate* requirement in 18 U.S.C. § 1343 is jurisdictional." *United States v. Jinian*, 725 F.3d 954, 965 (9th Cir. 2013) (emphasis added). The use of the wires, however, is a substantive element of the crime. *Pasquantino*, 544 U.S. at 371; *see also Garlick*, 240 F.3d at 792 (listing as an element of wire fraud the "use of the wires in furtherance of the scheme"). The requirement that the wires cross state or international lines for purposes of

federal jurisdiction does not mean that use of the wires is not the focus of the criminal offense under *Morrison*.

We therefore hold that, under *Morrison* step two, the "focus" of the wire fraud statute, 18 U.S.C. § 1343, is the use of the wires in furtherance of a scheme to defraud. *See Napout*, 963 F.3d at 179; *McLellan*, 959 F.3d at 469–70; *Bascuñán*, 927 F.3d at 122; *Garlick*, 240 F.3d at 792. So long as Hussain's use of the wires in furtherance of his fraud had a sufficient domestic nexus, we must uphold his convictions as "permissible domestic application[s]" of the statute. *RJR Nabisco*, 136 S. Ct. at 2101.

The facts demonstrate that all fourteen counts of wire fraud involved the use of domestic wires in furtherance of the scheme to defraud, and Hussain does not seriously contend otherwise. Six counts stemmed from phone or video conference calls among participants in the United Kingdom and California, five counts focused on emails originating or terminating in California, and three involved press releases distributed from England to California. Since each count of wire fraud involved the use of a domestic wire, each conviction is a domestic application of the statute. *Id.*[3]

### III

Hussain also challenges his conviction for securities fraud under 18 U.S.C. § 1348. The basis for this charge was Hussain's role in warranting financial information contained in an HP press release announcing the Autonomy acquisition. In a letter dated August 18, 2011, which

---

[3] Hussain concedes that the extraterritoriality analysis for conspiracy to commit wire fraud, 18 U.S.C. § 1349, mirrors the analysis for the substantive wire fraud provision. We agree. Therefore, sufficient evidence supports his conviction under § 1349 as well.

Hussain signed and to which a "draft press announcement" was attached, Hussain affirmed that to the best of his knowledge, "any information provided by me for inclusion in the Press Announcement . . . is and will be true and accurate in all respects and not misleading in any respect." Hussain in the letter also pledged to sell his shares of Autonomy.

The HP press release referenced in Hussain's letter was released the same day and was entitled "HP To Acquire Leading Enterprise Information Management Software Company Autonomy Corporation plc." The press release lauded Autonomy's "strong growth and profit margin profile" and claimed the acquisition would "[e]nhance HP's financial profile." It also provided details about Autonomy's financial success, namely, Autonomy's "consistent track record of double-digit revenue growth, with 87 percent gross margins and 43 percent operating margins in calendar year 2010."

At trial, two HP shareholders testified that they purchased HP stock based on statements in the press release about Autonomy's growth rate. An equity research analyst similarly testified that he reviewed the press release and used the information in it to advise investors. The government put on evidence to show that the statements in the press release about Autonomy's finances were false.

As relevant here, the securities fraud criminal statute prohibits executing a "scheme or artifice" "to defraud any person in connection with any" U.S.-registered security, 18 U.S.C. § 1348(1), or "obtain, by means of false or fraudulent pretenses, representations, or promises, any money or property in connection with the purchase or sale of any" U.S.-registered security, *id.* § 1348(2). This provision was enacted in 2002 as part of the Sarbanes-Oxley Act, and

it was "intended to provide prosecutors with a different—and broader—enforcement mechanism to address securities fraud than what had been previously provided." *United States v. Blaszczak*, 947 F.3d 19, 36 (2d Cir. 2019). The government charged Hussain under § 1348 and further alleged he aided and abetted securities fraud under 18 U.S.C. § 2.

In order to convict under § 1348, the jury was instructed that it must find Hussain (1) "knowingly executed or attempted to execute a scheme or plan to defraud or a scheme or plan for obtaining money or property by means of false or fraudulent pretenses, representations, or promises"; (2) "the statements made or facts omitted as part of the scheme were material"; (3) Hussain "acted with the intent to defraud"; and (4) "the scheme was in connection with the purchase or sale of securities of Hewlett-Packard company." *See also SEC v. Stein*, 906 F.3d 823, 830 (9th Cir. 2018); *United States v. Coscia*, 866 F.3d 782, 796 (7th Cir. 2017).

On appeal, Hussain attempts to mount a challenge to the third element and argues the government failed to prove the requisite fraudulent intent. But Hussain below barely raised this issue in passing in his Rule 29 motion, and the district court unsurprisingly did not address it. Hussain thus waived the argument, and we review a waived ground for acquittal only "to prevent a manifest miscarriage of justice." *United States v. Graf*, 610 F.3d 1148, 1166 (9th Cir. 2010) (quotations omitted).

There was no manifest miscarriage of justice. But even if we were reviewing de novo the result would be the same, as ample evidence would allow a rational jury to find that Hussain had the requisite mens rea. Hussain, a senior executive, knew HP was a publicly traded company and knew HP would publicize its acquisition of Autonomy to

investors, including through an important press release containing Autonomy's financial information the accuracy of which Hussain expressly warranted. A jury was entitled to conclude based on the evidence that Hussain intended to defraud HP and its investors.[4]

Hussain's primary challenge to his securities fraud conviction concerns the fourth element in the § 1348 jury instructions: in his view, the government failed to prove his fraudulent scheme was "in connection with" the purchase or sale of HP securities. Hussain does not dispute that he signed the August 18, 2011 letter and verified the supposed accuracy of the financial information in the press release. Instead, he assumes his conduct was fraudulent but maintains that verifying information in an HP press release that was later distributed to the investing public was conduct that was too attenuated to constitute a fraudulent scheme "in connection with" HP securities.

There is scant case law on § 1348, and this case does not require us to delve into every aspect of it. Instead, we are focused on § 1348's specific "in connection with"

---

[4] Alternatively, Hussain argues that a new trial is warranted because the district court's aiding and abetting jury instruction lacked the element of scienter. We review this for plain error because Hussain failed to raise this issue below. *See United States v. Lindsay*, 931 F.3d 852, 864 (9th Cir. 2019). There was no error, plain or otherwise. To find Hussain guilty of aiding and abetting securities fraud, the jury was instructed to find that he "willfully caused an act to be done which, if directly performed by him or another, would be an offense," if the evidence demonstrated "beyond a reasonable doubt" that Hussain "acted with the knowledge and intention of helping that person commit the crime charged." The jury instructions thus did not omit the mens rea requirement. Nor has Hussain shown that any error in the instructions affected his substantial rights. *United States v. Conti*, 804 F.3d 977, 981–82 (9th Cir. 2015).

requirement. We have not addressed this clause of § 1348 before, nor is it apparent that any other court of appeals has either, at least not in any depth. But § 10(b) of the Securities Exchange Act contains similar "in connection with" language. *See* 15 U.S.C. § 78j(b) (prohibiting "in connection with the purchase or sale of any security . . . any manipulative or deceptive device"). The Supreme Court has also noted it has given the "in connection with" requirement in § 10(b) a "broad interpretation," and that Congress cannot be "unaware of th[at] broad construction" when it uses similar language in other statutes. *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 85 (2006).

In light of this, we consider precedents involving § 10(b) in evaluating whether a rational jury could have found that Hussain's involvement in the press release met the "in connection with" requirement of § 1348. Indeed, like the government, Hussain himself in both the district court and this court has pointed to § 10(b) precedent as relevant to the § 1348 "in connection with" inquiry.

In the § 10(b) context, we have explained that "in connection with" is construed "broadly, 'not technically and restrictively.'" *Freeman Invs., L.P. v. Pac. Life Ins. Co.*, 704 F.3d 1110, 1117 (9th Cir. 2013) (quoting *SEC v. Zandford*, 535 U.S. 813, 819 (2002)). And we have held under § 10(b) that "[w]here the fraud alleged involves public dissemination in a document such as a press release, annual report, investment prospectus or other such document on which an investor would presumably rely, the 'in connection with' requirement is generally met by proof of the means of dissemination and the materiality of the misrepresentation or omission." *SEC v. Rana Research, Inc.*, 8 F.3d 1358, 1362 (9th Cir. 1993). In *McGann v. Ernst & Young*, 102 F.3d 390 (9th Cir. 1996), we therefore held that "an accounting firm

acts 'in connection with' securities trading when it produces an audit report that it knows its client will include in a Form 10-K," because such "public statements [are] reasonably calculated to influence those who trade securities." *Id.* at 394, 397. The Tenth Circuit has similarly held that § 10(b) may apply when a defendant "can fairly be said to have caused [the speaker] to make the relevant statements" and "knew or should have known that the statements would reach investors." *SEC v. Wolfson*, 539 F.3d 1249, 1261 (10th Cir. 2008).

In this case, and based on these precedents, the evidence presented at trial was sufficient for the jury to find that the "in connection with" element was met. The letter Hussain signed attached a "draft press announcement," and Hussain affirmed that the information included in the press release "provided by me" was "true and accurate in all respects and not misleading in any respect." A press release is a primary method of informing the market about an acquisition. And it can hardly be a surprise—especially to a sophisticated executive like Hussain—that investors could and would base their trading decisions on it. *See, e.g.*, *Rana Research*, 8 F.3d at 1362 (explaining that a press release is a "document on which an investor would presumably rely"). Indeed, press releases often form the basis for securities fraud allegations. *See, e.g.*, *SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1094–96 (9th Cir. 2010); *Rana Research*, 8 F.3d at 1362. Given the evidence presented at trial, Hussain's assurances that the financial information in the press release was accurate was sufficiently "in connection with" U.S. securities.

We cannot accept Hussain's arguments that his scheme falls outside § 1348 because it was only "in connection with" Autonomy securities, and that his misrepresentations were

directed at HP's management and not its investors. These arguments reflect an unduly narrow interpretation of § 1348. And they likewise reflect a cramped view of the import to the investing public of a press release about a major acquisition, as well as Hussain's personal role in verifying the accuracy of the Autonomy financial information included in the press release. The jury was entitled to reject Hussain's efforts to minimize the press release and his level of involvement in it.

\*   \*   \*

For the reasons stated here and in our accompanying memorandum disposition, the judgment of conviction is

**AFFIRMED.**