**In re HOMESTORE.COM, INC. SECURITIES LITIGATION.**

No. C01–11115 MJP (CWx).

United States District Court, C.D. California.

March 7, 2003.

Gary S. Soter, Clifford H. Pearson, Wasserman Comden Casselman & Pearson, Tarzana, CA, Jeffrey H. Dasteel, Katherine M. Pratt, Skadden Arps Slate Meagher & Flom, Los Angeles, CA, Joseph W. Cotchett, Bruce L. Simon, Robert G. Retana, Peter E. Borkon, Cotchett Pitre, Simon & McCarthy, Burlingame, CA, Tracey L. Worthington, Bernstein Litowitz, Berger & Grossman, San Diego, CA, for T. Jeffrey Simpson.

Joseph W. Cotchett, Bruce L. Simon, Mark Cotton Molumphy, Steven N. Williams, Nanci E. Nishimura, Robert G. Retana, Peter E. Borkon, Cotchett Pitre Simon & McCarthy, Burlingame, CA, for California State Teachers Retirement System.

Robert C. Vanderet, Seth Alben Aronson, Sharon Louise Tomkins, O'Melveny, & Myers, Los Angeles, CA, for Homestore.com, Inc.

Howard M. Privette, Paul Hastings Janofsky & Walker, Los Angeles, CA, for Stuart H. Wolff.

Robert C. Vanderet, Seth Alben Aronson, O'Melveny & Myers, Los Angeles, CA, Robert Charles Friese, Donna M. Herzing, Zesara Chan, Shartsis Friese & Ginsburg, San Francisco, CA, for Peter B. Tafeen.

Dean J. Kitchens, Lynn Marie Dean, Gibson Dunn & Crutcher, Los Angeles, CA, for PriceWaterhousecoope.

Ana C. Reyes, George Borden, F. Whitten Peters, Ryan T. Scarborough, Williams & Connolly, Washington, DC, John B. Quinn, Thad Alan Davis, Quinn Emanuel Urquhart Oliver & Hedges, Los Angeles, CA, for AOL Time Warner Inc.

Jeffrey H. Dasteel, Katherine M. Pratt, Skadden Arps Slate Meagher & Flom, Los Angeles, CA, Samuel Kader, Stephen P. Warren, Skadden Arps Slate Meagher & Flom, New York, NY, for Cendant Corp.

Stuart A. Shanus, Reed Smith Crosby & Heafey, Los Angeles, CA, for Dorado Corp.

Pamela J. Naughton, Sheppard Mullin Richter & Hampton, San Diego, CA, for Akonix Systems Inc.

## ORDER REGARDING MOTIONS TO DISMISS

PECHMAN, District Judge.

### INTRODUCTION

This Complaint provides one explanation of how the now-infamous internet "bubble"

occurred. Plaintiff in this putative class action is a shareholder in Homestore.com, Inc., ("Homestore") an internet-based company that provides links to a wide range of services related to home ownership, including real estate sales, home renovation, and relocation services. Plaintiff alleges in its complaint that several Homestore insiders, with the knowledge of Homestore's auditor and the active participation of various outside business entities, unlawfully created revenue through various types of dubious transactions in order to prop up Homestore's stock price. Plaintiff claims that these transactions, combined with improper accounting and the release of written and oral public statements made to the SEC, analysts, and the general public, perpetrated a fraud on Homestore's shareholders and the investing public in violation of Federal securities statutes and regulations promulgated thereunder. Eventually, Homestore was forced to restate seven quarters of revenue because of the improper transactions and accounting. By this action, plaintiff seeks to recover damages incurred when the market price of Homestore common stock fell dramatically once the need for restatement became public.

This is a massive piece of litigation. In all, plaintiff has named twenty-eight (28) defendants who allegedly made misleading statements or omissions and/or participated in a scheme to defraud investors in contravention of federal securities laws. The Court notes from the outset that two other aspects set this case apart from most securities litigation reported in the case law. First, plaintiff makes allegations based on inside sources who were most probably former executives at Homestore and therefore provide a unique insight not generally available to most private securities litigants. Second, four former Homestore executives have pled guilty to various criminal charges involving securities fraud and insider trading. Thus, this case does not present the question of *whether* the fraud actually happened, but rather who *knew* about it, who *participated* in it, and who can be *held liable* for it.

Defendants Homestore.com and Peter Tafeen have opted to answer the complaint. All other defendants with the exception of Jeff Kalina and Top Producers Systems have filed motions to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b) and the Private Securities Litigation Reform Act ("PSLRA") of 1995, 15 U.S.C. § 78u. Having considered the voluminous pleadings and papers filed by the parties, and having heard oral argument on the issues, the Court rules as follows:

1) The motions of the following defendants are hereby DENIED: Stuart H. Wolff (Dkt. No. 126), Pricewaterhouse Coopers, (Dkt. No. 185);

2) The motions of the following defendants are GRANTED, and the complaint as to each defendant is DISMISSED WITHOUT PREJUDICE: David Rosenblatt (Dkt. No. 116), Allan Merrill (Dkt. No. 104), Catherine Kwong Giffen (Dkt. No. 204), Sophia Losh (Dkt. No. 117);

3) The motions of the following defendants are GRANTED, and the complaint as to each defendant is DISMISSED WITH PREJUDICE: AOL Time Warner (Dkt. No. 122), Eric Keller (Dkt. No. 203), David Colburn (Dkt. No. 111), Cendant Corporation (Dkt. No. 202), Richard Smith (Dkt. No. 202), L90 (Dkt. No. 205), Akonix (Dkt.Nos.108–109), CityRealty (Dkt. No. 108–113), Classmates Online (Dkt. No. 110), Corner-Hardware (Dkt. No. 108), Dorado Corporation (Dkt. No. 108), GlobeExplorer (Dkt. No. 100), Internet Pictures (Dkt. No. 108), PromiseMark (Dkt. No. 108), RevBox (Dkt.

No. 108), SmartHome (Dkt. No. 108), and WizShop (Dkt. No. 153).

This order does not include or cover named defendants Privista, Inc, Top Producer Systems, Inc., or Jeff Kalina. Privista's Motion to Dismiss (Dkt. No. 209) was filed on February 24, 2003, and therefore will be noted for consideration on March 21, 2003, unless agreed otherwise by the parties.

## BACKGROUND

### A. *Factual Background*

Plaintiff makes the following factual allegations, which for purposes of this motion the Court must accept as true and construe in the light most favorable to the plaintiff. *No. 84 Employer–Teamster v. America West,* 320 F.3d 920, 930 (9th Cir. 2003). The Court evaluates these allegations with the presumption that a complaint should not be dismissed "unless it appears beyond a doubt that the plaintiff cannot prove any set of facts in support of the claim that would entitle him or her to relief." *Id., citing Williamson v. Gen. Dynamics Corp.,* 208 F.3d 1144, 1149 (9th Cir.2000). In this section, the Court gives a brief description of the parties, then an overview of the alleged illicit transactions that form the basis of the fraud, followed by a detailed factual recitation based on the plaintiff's allegations. Allegations specific to each defendant are analyzed separately below.

### 1. *The Parties*

Lead plaintiff California State Teachers' Retirement System ("CalSTRS"), a pension fund for California teachers, brings this putative class action against the defendants for damages arising from plaintiff's purchase of large amounts of Homestore common stock. These purchases were based on allegedly false or misleading financial statements filed with the SEC, as well as public comments made by the defendants.

For convenience, the Court has grouped the defendants into four general categories: present and former executives of Homestore ("the Insiders"), business partners involved in arranging various "triangular" transactions ("the business partners"), the third party vendors who typically sold services or stock to Homestore and purchased Homestore advertising ("the third party vendors"), and the auditor Pricewaterhouse Coopers ("PWC"). Factual allegations as to each category are similar in some respects, but the Court must consider the allegations made as to *each* individual defendant when determining whether the requirements of Federal Rules of Civil Procedure 12(b)(6) and 9(b) and the PSLRA have been met.

### a. *The Insider Defendants*

Insider defendants include Peter Tafeen, former Executive Vice President of Business Development and Sales; Stuart Wolff, former CEO and Chairman; David Rosenblatt, former Senior Vice President and General Counsel; Catherine Kwong Giffen, former Senior Vice President of Human Resources; Allan Merrill, current Executive Vice President of Corporate Development; Sophia Losh, former Senior Vice President of the Strategic Alliance Group ("SAG"); and Jeff Kalina, former Director of Transactions. Other major participants in the scheme include Joseph Shew, former Vice President of Finance and later CFO; John Giesecke, former CFO, and John DeSimione, former Director of Operations, Planning and Transactions in the Finance Department. These last four pled guilty to various criminal charges of corporate financing fraud and insider trading. The Complaint alleges that each and every one of these inside

defendants was motivated by personal profit to keep the price of Homestore stock high so that each could reap huge benefits from selling off vested and exercised stock options. Plaintiff alleges that these sales constituted illegal insider trading.

### b. *The Business Partner Defendants*

There are three major players in the business partner category, with three individuals closely associated. Plaintiff alleges that America Online Time Warner ("AOL") was a major player in arranging many of the illicit revenue boosting transactions. AOL employees David Colburn and Eric Keller are also named as defendants for their roles as the primary Homestore contacts within AOL and the architects of many of the improper "round trip" transactions. Both were released by AOL under suspicion of certain illegal transactions with Homestore and other companies. Plaintiff does allege, however, that the transactions continued after the two individuals left, further implicating AOL in the scheme to defraud.

Cendant Corporation ("Cendant") is a major player in the on-line real estate business, and has substantial activities in the car rental and travel industries as well. Plaintiff alleges that Cendant and its CEO Richard Smith engaged in "triangular" transactions between Homestore, Cendant and one of Cendant's subsidiaries. This transaction also represents a "related party" transaction that was not appropriately accounted for as such.

L90 is a media company. Plaintiff alleges that L90 engaged in illegal "triangular" transactions and "barter" transactions with Homestore and third parties.

### c. *"Third Party Vendors"*

This is a catchall group of participants that is made up of smaller, thinly capitalized startup companies that allegedly engaged in illegal transactions with Homestore. They were either involved in barter transactions, "revenue purchasing" schemes, or made up the third leg of a "triangular" transaction, typically orchestrated through AOL.

### d. *Pricewaterhouse Coopers*

PWC is a defendant in this action for its role in overseeing, approving and failing to properly audit the various transactions described below. Plaintiff alleges that PWC did not follow Generally Acceptable Auditing Standards and either tacitly approved and/or failed to reject several of the improper transactions and the accounting thereof.

### 2. *The Transactions*

There are basically three different but related types of transactions that are alleged to have taken place, all of which created "revenue" for Homestore through various ways that the transactions are "booked." These are the "barter transactions," "buying revenues" or "revenue purchasing," and the "triangular transactions." Below is a brief description of each one, though the complaint contains multiple descriptions of these accompanied by diagrams.

"Barter transactions"—These are two-party reciprocal transactions. Plaintiff alleges that Homestore and other companies agreed to trade services, generally advertising for some amorphous service such as "web services" or "marketing solutions." Then, instead of just trading those services, the two companies agree to buy each other's services for an extremely exaggerated rate. For example, Homestore might pay $5 million for marketing solutions, and the other company pays $5 million for advertising. Homestore then realizes the $5 million in revenues. The problem is that in accounting for these transactions, Homestore is supposed to provide actual

market value of the services, "net out" the cost of the reciprocal transaction (making the net revenue zero), and report the two transactions as linked. Homestore allegedly did not properly account for transactions on several occasions.

"Buying revenues"—These are two-party transactions as well, and are very similar to the barter transactions. The difference is that in this instance Homestore trades stock "warrants" (a form of stock option) for some service, and receives cash for some other service like advertising. The true transaction is the cash for the warrants, known as a "stock-for-revenue" transaction, which must be reported as such in accounting for the transactions. In addition, many of these transactions involved a guarantee by Homestore of a certain stock price by a specified date in the future—if the stock was not worth the amount guaranteed, Homestore was to be responsible for the difference. This is a safe transaction for the other company, but a very risky way of creating revenues for Homestore.

"Triangular transactions," a.k.a. "round-tripping"—These are slightly more complex transactions involving three parties. The transactions allegedly arranged through defendant AOL provide good examples. AOL and Homestore entered into a "revenue sharing agreement" or "advertising reseller agreement" in which AOL agreed to sell advertising for Homestore for a commission. This commission was far above market value. This agreement may be valid on its own, but set the stage for allegedly illegal transactions. Homestore would find some third party corporation, one that was thinly capitalized and in search of revenues in order to "go public." Homestore then agreed to purchase shares in that company for inflated values or to purchase services or products that Homestore did not need. This transaction was contingent on the third party company "agreeing" to buy advertising from AOL for most or all of what Homestore was paying them. The money thus flowed through the third party to AOL, which then took a commission and shared "revenue" with Homestore. This is an exceptionally expensive way to create revenue due to the cuts taken in each step along the way. This practice depleted the cash reserves of Homestore, but created "revenue" in order to meet the revenue targets, resulting in an inflated stock price.

### 3. *Detailed Factual Recitation*

The First Amended Consolidated Complaint ("FACC") sets forth the following specific allegations regarding the improper transactions between Homestore and the other defendants:

In 1996, Stuart Wolff founded "Realtor.com," the predecessor to Homestore, which listed real estate on the internet. FACC ¶ 88. Homestore was founded shortly thereafter, and eventually "went public" in 1999. *Id.* As with all internet companies of the 1990's, revenue growth was an important indicator of the financial well-being of the company. FACC ¶¶ 88, 109. Accordingly, there was enormous pressure on Homestore to show increasing revenues each quarter. FACC ¶ 109.

The relationship between Homestore and defendant AOL began in April of 1998, when Homestore purchased from AOL the exclusive right to have the only online real estate listing product on the AOL web site. FACC ¶ 113. Homestore purchased this exclusive right for $20 million in cash to be paid in installments as well as $1.5 million in Homestore warrants at various "strike prices." *Id.* Thus, when an AOL member sought real estate listings on the AOL website, that member would be directed to the Homestore.com website. FACC ¶ 114.

The inception of the defendants' scheme to deceive, manipulate and/or defraud the

marked occurred in 1998 when Homestore entered into a series of improper "barter transactions" that formed the basis for transactions that were later restated. FACC.¶111. The Court notes, however, that the class period does not begin until the first quarter of fiscal year 2000 ("FYE 2000"), the first quarter in which Homestore was later required to restate its revenues. Therefore, these transactions predating the class period are not described in detail here, but merely provide a background for the alleged improper transactions made during the class period. First, during the last half of fiscal year 1998 ("FYE 1998"), Homestore entered into reciprocal contracts constituting a barter transaction with RE/MAX International, Inc. FACC ¶118. Next, in the third quarter of fiscal year 1999 ("FYE 1999"), Homestore entered into reciprocal transactions with Wells Fargo Bank in which Homestore in essence traded 500,000 of its own warrants for $20 million in revenue. FACC ¶¶119–22. Then in the fourth quarter of FYE 1999, Homestore entered into similar reciprocal transactions with General Motors Acceptance Corporation ("GMAC") in essence trading 100,000 warrants at a specified strike price for another $20 million in revenue. FACC ¶¶126–28.

Meanwhile, in the first quarter of FYE 1999, Homestore entered into an advertising reseller agreement with AOL (hereinafter, the "second AOL agreement"). By this agreement, AOL would sell advertising on the Homestore website to third parties. FACC ¶124. AOL would retain a commission on the sale, and remit the remaining portion of the advertising revenue to Homestore. Id. AOL's commission was as high as 50% or more of the amount obtained from the third party company. FACC ¶337.

Plaintiff alleges that most of the improper transactions described below occurred near the end of the quarter when Homestore realized that the company might fall short of revenue targets set by Wolff and/or market analysts. They were one time, non-recurring deals, the purpose of which was to "fill the plug" or "make the bogie."

During the first three quarters of FYE 2000, Homestore entered into a series of "equity deals" that constituted Homestore "buying revenues." FACC ¶139. In these transactions, Homestore would purchase stock of seemingly worthless companies. Id. In return, these companies agreed to purchase advertising on Homestore's website, using the money obtained in the stock sale. Id.. These companies included defendants Dorado Corporation ("Dorado"), CornerHardware.com ("CornerHardware"), RevBox, Inc. ("RevBox"), and SmartHome, Inc. ("SmartHome"), as well as non-defendants Investor Plus, and OnlineChoice.com, Inc. FACC ¶140. Homestore then booked its recycled money as revenue. FACC ¶142. Meanwhile, PWC reviewed each of these "investment and distribution" deals, which in total resulted in approximately $40 million in revenues recognized by Homestore. FACC ¶147. There was much debate between PWC and Homestore executives regarding whether these transactions should be reported as gross revenues, or if they should be "netted out" against each other. Id. PWC allowed these transactions to be reported as gross, but later forced Homestore to report nearly identical transactions as net. Id.

Throughout FYE 2000, Homestore entered into several other reciprocal, round trip transactions with third party vendors, including defendants CityRealty.com, Inc. ("CityRealty"), Classmates Online, Inc. ("Classmates"), PromiseMark, Inc. ("PromiseMark"), Privista, Inc. ("Privista") and Akonix Systems, Inc. ("Akonix"), as well as non-defendant iPlace. FACC

¶¶ 148–50. In the first leg of each transaction, Homestore would pay cash to the third party vendor in exchange for advertising or other services. FACC ¶ 151. In the second or reciprocal component of the transaction, the third party vendor would recycle that cash in a nearly identical amount to Homestore in exchange for advertising or other services. *Id.* PWC had knowledge of the details of each of these transactions, and began to question their round trip nature in late 2000. FACC ¶ 152. PWC required the "netting" of some, but not all, of these transactions, including the CityRealty transaction in the first quarter of 2001. *Id.*

In May of 2000, Homestore and AOL entered yet another agreement (hereinafter the "third AOL agreement"). The agreement established Homestore as the exclusive distributor of home-buying and moving services across AOL properties. FACC ¶ 154. The agreement also required AOL to establish the "House & Home" channel on its website for which Homestore would be the exclusive content provider, and included a revenue sharing agreement to share revenue generated from the traffic on that channel. *Id.* In return, AOL would obtain 3.9 million shares of Homestore stock at the guaranteed price of $68.50 per share, as well as $20 million in cash. *Id.* AOL would also receive a $90 million letter of credit that it could use if Homestore's stock did not meet the guaranteed price. *Id.* The agreement received a great deal of news coverage, and analysts predicted that Homestore would exceed the guaranteed strike price. FACC ¶ 155–56. Plaintiff alleges that this transaction was improper because it constituted a "stock-for-revenue" transaction. FACC ¶ 158.

During the fourth quarter of FYE 2000, Homestore entered into another "stock-for-revenue" transaction, this time with Bank of America. FACC ¶ 159. The agreement involved the exchange of 600,-000 unregistered shares of Homestore stock, advertising, and website services for $4.5 million in cash, with $15 million to follow, and "marketing solutions" for My-HomeSolutions.com. *Id.* PWC reviewed and approved this transaction, which was one of the transactions for which revenue was later restated. FACC ¶ 161.

In late 2000, Homestore announced that it would acquire Cendant Corporation's on-line real estate web site, Move.com. FACC ¶ 166. Homestore and Cendant completed this acquisition through a complex multi-legged transaction. First, Homestore gave Cendant 21.4 million shares of Homestore stock (a 20% share) worth approximately $750 million as payment for 100% of the stock in Move.com and another Cendant subsidiary, Welcome Wagon. FACC ¶ 167–68. Cendant's acquisition of a 20% share of Homestore allowed it to elect two seats on the Homestore board, one of which was occupied by defendant Richard Smith. FACC ¶ 169. Second, Cendant funded the Real Estate Technology Trust ("RETT") with $95 million. FACC ¶ 167. Third, RETT paid Homestore $80 million for certain commercial products and services. *Id.* These three transactions were simultaneous and contingent upon one another, and were considered "related party" transactions. FACC ¶ 170. PWC was "concerned" about the reciprocal nature of the transaction, and involved its national office in the accounting. *Id.*

Meanwhile, RETT was left with $15 million remaining in cash. During the first quarter of FYE 2001, Homestore had acquired Internet Pictures Corporation ("iPix"). FACC ¶ 141. When Homestore needed revenues, its executives arranged through Cendant for RETT to purchase $15 million worth of "virtual tours" of houses. FACC ¶ 172. Homestore in turn agreed to give back the money through the

purchase of $15 million in products from Cendant. *Id.* Defendant Tafeen allegedly signed a contract evidencing the return of the money, but hid it so that PWC would not discover the reciprocal nature of the transactions. FACC ¶ 385.

During the first quarter of FYE 2001, Homestore entered into a series of illegal triangular transactions with third party vendors, resulting in "revenue" for Homestore. FACC ¶ 174. These transactions involved third party vendor defendants Classmates and Wizshop, as well as non-defendants PurchasePro, InvestorPlus, EasyRoommates, and FX Consultants. FACC ¶ 176. First, Homestore would buy a product from a third party vendor on the condition that the third party vendor would purchase Homestore advertising from AOL. FACC ¶ 175. AOL would then take a commission and round trip Homestore's own money back to it under the reseller agreement. *Id.* The parties all agreed that AOL would not document the agreement by the third parties to purchase advertising from AOL. FACC ¶ 177. These transactions allowed Homestore to realize approximately $15 million in "revenue." FACC ¶ 176.

During the second quarter of FYE 2001, Homestore entered into a modified triangular transaction with InvestorPlus, a subsidiary of "IPG". FACC ¶ 178. Homestore had an accounts receivable with IPG totalling $5 or $6 million dollars from a previous transaction. *Id.* Now, Homestore agreed to forgive that debt in exchange for a website valued at $6 million, and IPG agreed to purchase advertising from AOL. FACC ¶ 179. Homestore's money was then returned to it pursuant to the advertising reseller agreement. *Id.* The agreement to purchase advertising from AOL was not reported as related to the agreement to forgive the accounts receivable. FACC ¶ 181.

During that same quarter, Homestore entered into a round trip transaction in acquiring "Homestyles," a subsidiary of Buildnet. FACC ¶ 182–83. This transaction was negotiated and orchestrated by defendant Allan Merrill. FACC ¶ 182. In this set of transactions, Homestore paid Buildnet $23 million in cash to acquire Homestyles. FACC ¶ 183. Buildnet then paid between $5 and $6 million to AOL for Homestore advertising. *Id.* Some of this money was then round tripped back to Homestore, and was recognized as revenue. FACC ¶ 184.

During the second and third quarters of FYE 2001, Homestore entered into triangular transactions with defendant L90 that were similar to those involving AOL. FACC ¶ 185. In these transactions, Homestore paid cash to a third party vendor such as "Hi–Speed Media" in exchange for purported goods and/or services. *Id.* That company then used that money to pay L90 for purported goods and/or services. *Id.* Finally, L90 recycled the money back to Homestore for advertising, which would be recognized as revenue. *Id.*

The FACC also details a great number of press releases, analyst reports, news articles, and SEC filings that relate to or are based upon the above-described transactions. *See* FACC ¶¶ 186–195. The FACC also independently pleads scienter for each of the defendants. *Id.* pp. 103–238. For the sake of brevity, the Court will not discuss those allegations in detail here, but rather will reference those that are pertinent when analyzing the allegations as to each defendant.

### B. *Legal Background*

Congress enacted the Securities Exchange Act of 1934 to regulate various practices of trading in securities in an effort to correct many of the abuses that led to the stock market crash of 1929.

Plaintiffs in this case have brought causes of action under Sections 10(b) and 20(a) of the Act, as well as under the Security and Exchange Commission's ("SEC") Rule 10b–5, which implements § 10(b) of the Act. Section 10(b) of the Act states in relevant part:

> It shall be unlawful for any person, directly or indirectly ... (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may proscribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). Rule 10b–5 implements this statute, stating:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice or course of business which operated or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5. Section 20(a) of the Act confers liability on those who direct others to commit violations of the Act:

> 1) Joint and Several liability; good faith defense
>
> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a). Therefore, in order to allege a violation of § 20(a), plaintiff must establish a strong inference of (1) a primary violation of federal securities laws; and (2) that the defendant exercised actual power or control over the primary violator. *Howard v. Everex Systems, Inc.*, 228 F.3d 1057, 1065 (9th Cir.2000).

### 1. *The Private Securities Litigation Reform Act of 1995*

In 1995, Congress enacted the Private Securities Litigation Reform Act, 15 U.S.C. § 78u, over a presidential veto. By this legislation, Congress "sought to reduce the volume of abusive federal securities litigation by erecting procedural barriers to fraud claims." *In re Silicon Graphics, Inc. Securities Litigation*, 183 F.3d 970, 977 (9th Cir.1999). Put another way, the PSLRA was intended "to put an end to the practice of pleading 'fraud by hindsight,'" by which investors allege fraud by questioning past corporate decisions once a company's stock price has dropped. *Id.* at 988. In relevant part, the PSLRA states:

> (b) Requirements for securities fraud actions
>
> 1. Misleading statements and omissions
>
> In any private action arising under this chapter in which the plaintiff alleges that the defendant—
>
> (A) made an untrue statement of a material fact; or

(B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading;

the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

2. Required state of mind

In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

15 U.S.C. § 78u–4(b)(1) and (2). The state of mind requirement is known as the "scienter" requirement. With respect to "forward-looking" statements, the PSLRA requires that the plaintiff plead and prove that the person making the statement had "actual knowledge" of its falsity or misleading character at the time the statement was made. 15 U.S.C. § 78u–5. This last requirement is designed to prevent insiders from being liable for mere "puffery" or corporate optimism.

As with any litigant alleging fraud, the PSLRA plaintiff must plead with particularity all facts demonstrating that a specific defendant made a statement or committed an act or was involved in a scheme that was false or misleading. But the PSLRA goes beyond the requirements of Rule 9(b) and requires that the securities fraud plaintiff must plead facts demonstrating *why* the statement, act or scheme is misleading. Thus, not only does the PSLRA

require that both falsity and scienter to be pled with specificity, it requires that the facts pled must give rise to a "strong inference" that each defendant acted with the requisite state of mind. But what is that state of mind? And what is a "strong inference"? Finally, how much specificity is enough? These are the questions that courts have struggled with since the passage of the PSLRA.

The Ninth Circuit first squarely addressed the issue of scienter under the PSLRA in *In re Silicon Graphics, Inc. Securities Litig.*, 183 F.3d 970 (9th Cir. 1999). There, the court held that a plaintiff "must plead, in great detail, facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct." *Id.* at 974. Specifically, the court stated:

We hold that although facts showing mere recklessness or a motive to commit fraud and opportunity to do so may provide some reasonable inference of intent, they are not sufficient to establish a *strong* inference of deliberate recklessness. In order to show a strong inference of deliberate recklessness, plaintiffs must state facts that come closer to demonstrating intent, as opposed to mere motive and opportunity.

*Id.* (emphasis in original). The court therefore seems to have converted what was a standard of "an extreme departure from the standards of ordinary care," which is the definition of recklessness, to one that approaches the standard for "intent." *Id.* at 976.

Because the facts that support inferences of falsity and scienter are almost always the same, the Ninth Circuit has collapsed the elements into a single inquiry: "whether the particular facts in the complaint, taken as a whole, raise a strong inference that defendants intentionally or [with] deliberate recklessness made false

or misleading statements." *Ronconi v. Larkin*, 253 F.3d 423, 429 (9th Cir.2001). Alternatively, a complaint may allege facts giving rise to a strong inference of intentional misconduct or deliberate recklessness in the participation in a scheme or deceptive device to defraud investors. *No. 84 Employer–Teamster v. America West*, 320 F.3d at 937 (holding that controlling shareholders could be held liable for insider trading, which qualifies as a deceptive device).

2. *Central Bank of Denver v. First Interstate Bank of Denver, 511 U.S. 164 (1994), and the Bar on Aider and Abettor Liability*

Each of the outside defendants argues strenuously that they cannot be held liable under § 10(b) and Rule 10b–5 as a result of the Supreme Court's decision in *Central Bank of Denver v. First Interstate Bank of Denver*, 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994), holding that the Securities Exchange Act and the rules promulgated thereunder did not provide for aider and abettor liability. In that case, a public housing authority issued a series of bonds to finance public improvements. *Id.* at 167, 114 S.Ct. 1439. The bonds were secured by land under a covenant that required that the land be valued at 160% of the value of the bond. *Id.* A question arose as to the actual value of the land that secured these particular bonds, which were held by indenture trustee Central Bank. *Id.* Land values were decreasing at the time, and a Central Bank underwriter expressed concern that the 160% requirement was not being met. *Id.* Central Bank was going to order an independent review, but the housing authority convinced it to hold off for 6 months. *Id.* at 168, 114 S.Ct. 1439. In the meantime, the authority defaulted on the bonds. *Id.* Central Bank was sued for its acquiescence as an aider and abettor of the primary viola-

tors, who included the authority and the underwriters. *Id.*

In reversing the Court of Appeals, the Supreme Court analyzed the text and legislative history of the Securities and Exchange Act and determined that only primary violators of the Act could be held liable for fraudulent acts or misleading statements or omissions. The statute itself provided for no secondary aider and abettor liability.

Each of the seventeen "outside" defendants defined above as "business partners" and "third party vendors" has asserted that even if all allegations concerning their participation in Homestore's fraudulent acts are true, which for purposes of this motion this Court must assume, they cannot be held liable because their actions constitute mere "aiding and abetting."

3. *Liability of the Auditor Pricewaterhouse Coopers*

A plaintiff alleging a violation of Section 10(b) and Rule 10b–5 against an independent auditor such as PWC must satisfy the requirements of the PSLRA by alleging with specificity that "the accounting practices were so deficient that the audit amounted to no audit at all, or an egregious refusal to see the obvious, or to investigate the doubtful, or that the accounting judgments which were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts." *DSAM Global*, 288 F.3d at 390; *citing In re Worlds of Wonder Secs. Litig.*, 35 F.3d 1407, 1426–27 (9th Cir.1994).

ANALYSIS

In determining the sufficiency of the FACC, the Court applies the above-stated legal standards to the facts alleged as to each defendant. For the insider defendants, the Court simply ascertains whether

the pleading requirements of the PSLRA have been met. As for the business partner and third party vendor defendants, the Court holds that the Supreme Court's decision in *Central Bank* precludes liability from being asserted against these aiding and abetting defendants as a matter of law. Therefore, no analysis of sufficiency of the Complaint is required. Finally, the Court determines whether the FACC alleges sufficient facts as to PWC in light of the PSLRA and the case law setting the standards for auditor liability.

### A. The Insider Defendants

The Court must determine whether the facts alleged as to each of the insider defendants raises the required "strong inference" of intentional misconduct or "deliberate recklessness" as to the relevant false or misleading statements, acts, or scheme. *In re Silicon Graphics*, 183 F.3d at 974; *No. 84 Employer–Teamster v. America West*, 320 F.3d at 937.

From the outset, two legal issues must be resolved. First, the Court must address plaintiff's allegations regarding the insider defendants' stock sales. Second, the Court addresses plaintiff's reliance on the "group published" doctrine in its attempt to assign many of the inside defendants.

In support of its allegations of scienter, plaintiff claims that each of the inside defendants' sales of Homestore stock were unusual or suspicious and constituted insider trading. Unusual or suspicious stock sales may be circumstantial evidence of scienter, but only when the sales are "dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." *In re Apple Computer Secs. Litig.*, 886 F.2d 1109, 1117 (9th Cir. 1989). A non-exclusive list of factors to consider includes: 1) the amount and percentage of shares sold by the insider, 2)

the timing of the shares, and 3) whether the sales were consistent with the insider's prior trading history. *Silicon Graphics*, 183 F.3d. at 986.

In this case, two trading restrictions affected these factors. First, there was a 180–day window after the IPO of Homestore.com during which insiders were not allowed to sell shares. Second, the insiders had a 30–day (approximate) window in which to sell shares each quarter. This window began 3 days after each quarterly filing and ended 30 days prior to the start of the next quarter. The Court finds that none of the stock sales histories of any of the insider defendants is properly pled to support an inference of scienter. First, plaintiff does not provide the percentage of holdings sold in each of the transactions. The Court finds this to be a key piece of information in deciding whether stock sales support an inference of deliberate recklessness as to any fraudulent statement, act, or scheme. Second, the timing of the sales is not suspicious. The insider defendants were restricted to a specific trading window during which they could sell stock—that window occurs *after* the release of public financial statements. This restriction is presumably in place in order to keep insiders from dumping their stock just prior to the release of adverse information. The trading window also explains why the insider defendants had common trading days. The timing is simply not suspicious. Third, there is no showing that sales made within the class period were somehow inconsistent with the insiders' trading histories. In many cases, no trading history was available, since the insiders were restricted from trading within the 180 days after the company went public. Because the Court finds that none of the insiders' stock sales were unusual or suspicious, these allegations will not be considered in the individual analyses below.

Next, the Court analyzes the viability of the "group published doctrine" after the enactment of the PSLRA. Prior to the enactment of the Reform Act, this doctrine allowed for a presumption that false and misleading information conveyed in documents, including press releases, are made by the collective action of the officers of a corporation. *In re GlenFed, Inc.*, 60 F.3d 591, 593 (9th Cir.1995). Yet even then, the doctrine applied only to defendants who either "participated in the day-to-day corporate activities or had a special relationship with the corporation, such as participation in preparing and communicating group information at particular times." *Id.*

Since the enactment of the PSLRA, district courts in this circuit have struggled with the doctrine's continued viability in light of the PSLRA's stringent pleading requirement regarding scienter. Of the courts that have heard the issue, some have continued to recognize the continued viability of the group published doctrine despite the enactment of the PSLRA. *In re Secure Computing Corp. Secs. Litig.*, 120 F.Supp.2d 810, 821–22 (N.D.Cal.2000) (applying doctrine to officers and members of executive committee after enactment of PSLRA); *In re Stratosphere Corp. Sec. Litig.*, 1 F.Supp.2d 1096, 1108 (D.Nev. 1998) (holding that PSLRA did not abolish doctrine, and applying it to those with high level positions within a company); *but see Allison v. Brooktree Corp.*, 999 F.Supp. 1342, 1350 (C.D.Cal.1998) (doctrine's continued vitality suspect where the PSLRA refers specifically to pleading specific facts as to the misleading statements of *the defendant*, not a group of defendants, and where it is not reasonable to presume that in every case every officer joined in the scheme to fraud investors).

For purposes of the present case, this Court holds that, at a minimum, plaintiffs must explain the nature of the misrepresentation in the published statement, and establish that the defendants were involved in the day-to-day management of those parts of the corporation involved in the alleged fraud. *Pegasus Holdings v. Veterinary Ctrs. of America, Inc.*, 38 F.Supp.2d 1158, 1166 (C.D.Cal.1998). Furthermore, "with regard to allegations concerning the liability of the individual defendants for 'group published' information, plaintiffs must indicate the statements that they contend fall under the doctrine." *In re Autodesk, Inc. Secs. Litig.*, 132 F.Supp.2d 833, 846 (N.D.Cal. 2000).

### 1. Homestore.com and Peter Tafeen

The Court simply notes that defendants Homestore.com and its former Executive Vice President of Business Development and Sales Peter Tafeen have opted to answer the complaint rather than file motions to dismiss.

### 2. Stuart Wolff

■ Defendant Wolff moves to dismiss the FACC on the ground that the facts alleged as to him do not establish deliberate recklessness as to any of Homestore's fraud. Mr. Wolff primarily argues 1) that the FACC does not support a strong inference that he knew of improper accounting; 2) that allegations regarding his stock sales do not support a strong inference of scienter; and 3) that his statements of general corporate optimism and forward looking statements are immaterial and/or insufficient to state a claim. The Court disagrees, and finds that the factual allegations in the FACC, when considered cumulatively and in context, are sufficient to support a "strong inference" of deliberate recklessness.

First, the Complaint provides important background information giving insight into defendant Wolff's state of mind. Wolff was the CEO, Chairman and co-founder of

Homestore. Plaintiff alleges that he was a controlling manager with a hands-on managerial style, and thus was in a position to know how revenue was being recognized. FACC ¶ 437. He was obsessed with the "revenue growth rates" at the company, and set unrealistically high revenue targets each quarter because he wanted to compete with major internet companies. FACC ¶¶ 328, 439, 585, 601. Plaintiff alleges that Wolff's obsession with hitting revenue targets, combined with his concern for selling his own stock, set the stage for the illegal revenue recognition that eventually took place. FACC ¶ 578. These allegations, standing alone, support no inference of deliberate recklessness. However, they provide important background information by which to assess other alleged facts.

Plaintiff also alleges that defendant Wolff received and understood internal reports that document the fraud. Specifically, plaintiff alleges that Wolff received and understood the periodic "Risk and Opportunity" ("R & O") schedules circulated to senior management. FACC ¶ 328 and Ex. E. The purpose of these schedules was to evaluate the quality of anticipated revenues for the quarter, and to determine what the shortfall would be for hitting the quarterly revenue targets. *Id.* Plaintiff alleges that senior management understood that "good quality" revenues frequently would not materialize, and that the company would have to scramble in the last few days of the quarter to make the "plug" or "bogie." *Id.* Additionally, separate schedules were created to assess the costs involved in the triangular deal done with AOL in the first quarter of FYE 2001. FACC ¶ 348. Wolff himself presented a schedule depicting the triangular nature of the AOL deals. *Id.* All those who received these schedules also understood that they depicted the cost of "buying revenue," as detailed in line items such as "SAG carry-over costs," and knew that these amounts would not be coming back to Homestore because of the commission taken by AOL. FACC ¶ 338, 348.

Next, plaintiff alleges that Wolff was intimately involved with statements to analysts, investors, and the public. FACC ¶ 437. For example, in conjunction with an October 19, 2000, press release, defendant Wolff was quoted as saying, "This quarter we joined an elite group of Internet companies that have achieved cash profitability," touting the company's *past* successes. FACC ¶ 214. This statement is neither forward looking, nor mere "puffery." This is a definitive statement about a specific aspect of the company's financial health, and was made while Mr. Wolff was in possession of non-public information that would prove his statements false. That knowledge is proven by Mr. Wolff's possession and understanding of the R & O sheets and the end of the quarter deals that were made simply to meet or beat the revenue targets.

Plaintiff alleges that Wolff was also obsessed with increasing the value of Homestore common stock in order to sell his own personal holdings at the highest possible value. FACC ¶ 444. Wolff also apparently instructed other Homestore insiders as to volume and timing of stock sales so as not to alarm Wall Street. FACC ¶¶ 456, 458, 469, 511, 518. He personally sold 693,600 shares for proceeds of $13,763,389.75. FACC ¶ 429. While the sales of stock themselves do not support an inference of scienter as "dramatically out of line" with his prior trading history, *In re Apple Computer,* 886 F.2d at 1117, the fact that he instructed others in how to sell off holdings without raising suspicions, a fact this Court must accept as true, supports an inference that Mr. Wolff was trading on non-public information, yet trying to avoid detection. This fact goes di-

rectly to defendant Wolff's culpable state of mind and supports a finding of scienter.

Wolff was involved in the negotiation and orchestration of many of Homestore's illicit revenue transactions. Specifically, plaintiff alleges that Wolff knew of the improprieties of the triangular transactions with AOL, and knew that Homestore did not document the "hidden" third leg of these transactions in which third party vendors purchased Homestore advertising from AOL. FACC ¶ 335. Again, Wolff attended meetings in which accounting schedules were circulated that clearly depicted the cost of the triangular deals. FACC ¶ 338. Wolff told Shew that he did not like the AOL deals, but rationalized them as a one-time occurrence that would be covered up by the potential AOL merger or an upswing in the economy. FACC ¶ 344.

Perhaps the most revealing allegations tending to show defendant Wolff's scienter are those of the "pre-meeting" at the Cal Amigos Ranch Retreat, which took place on May 7, 2001. FACC ¶ 349. The FACC describes a meeting that included Wolff, Tafeen, Shew and Giesecke, the entire focus of which was how to buy revenues. The current R & O schedule was discussed, which depicted an impending revenue shortfall of $40–50 million. FACC ¶ 350. Wolff and Tafeen both asked if there were any other sources of "good revenues." *Id.* Tafeen suggested that they try another Cendant or AOL barter deal. *Id.* At one point, Wolff wondered out loud: "where do we get the revenue?" *Id.* While brainstorming about how to come up with the "plug," Shew explained to everyone that as a result of "raising the guidance" and the fact that only net revenues could be booked, a much larger amount would be needed. FACC ¶ 351. The four discussed a deal with Cendant, and while both Shew and Giesecke acknowledged that a Cendant deal could happen, they reiterated

that the "back end" could not be documented. FACC ¶ 351. Thus, this small group of executives plotted a scheme to create revenues to make the target, and discussed how to manipulate the documentation in order to avoid detection by PWC. The description of this pre-meeting leaves little room for interpretation. The Court finds that the very detailed allegations concerning this meeting raise a strong inference of at least deliberate recklessness regarding a scheme to defraud Homestore's shareholders and the investing public. Plaintiff has alleged that it was explained to Wolff in no uncertain terms that certain aspects of certain transactions could not be disclosed to Homestore's own auditor. The FACC thereby alleges sufficiently specific facts that tend to support a strong inference of intentional misconduct or at the very least deliberate recklessness.

The Court also notes that defendant Wolff signed each and every one of the SEC-mandated financial reports on behalf of Homestore. FACC ¶ 437. Wolff tries to argue that this doesn't mean that he understood what he was signing or that he in any meaningful way participated in their fraudulent nature or content. The Court finds this argument hard to accept in the context of the other allegations contained in the Complaint. "Key corporate officers should not be allowed to make important false statements knowingly or recklessly, yet still shield themselves from liability to investors simply by failing to be involved in the preparation of those statements." *Howard v. Everex,* 228 F.3d 1057, 1062 (9th Cir.2000). While a signature alone may not be enough to establish liability, the signing of Homestore's filing does establish that Mr. Wolff made "statements" within the meaning of the act and the rule. Plaintiff has independently alleged Wolff's scienter as to the falsity or misleading nature of those statements.

Even in the face of these specific factual allegations, Mr. Wolff claims that nothing in the complaint alleges that he knew that improper accounting was going on. Mot. at 7. Even if "actual knowledge" were the standard instead of "deliberate recklessness," this claim of innocence falls flat. Lest there be any doubt as to the sufficiency of allegations about Mr. Wolff's scienter as to accounting practices, the Court cites at length from paragraph 359 of the Complaint:

359. On June 29, 2001, the last day of the second quarter, AOL had yet to receive confirming letters from a number of the third party vendors about placing the required advertising. AOL was taking the position that it could not agree to pay Homestore until the letters were received .... Ripp called back late in the evening on the 29th, and Wolff gathered Shew for the call who then told Giesecke that AOL was on the line and that AOL had not yet authorized most of the deal. Wolff, Tafeen and Shew got on the line and at some point Giesecke came in as well ... **DeSimone, Kalina and Tafeen put a schedule together for Wolff so that he could address the details of the deal**. Wolff emphasized that the deal had been agreed to long ago by Keller, and he threatened litigation. Ripp and Rindner said that Keller was gone, but never denied Keller's authority to do the deal or that he had done the deal. Wolff responded that Keller was the authorized agent acting for AOL when he cut the deal, and suggested if there was any doubt about it, they should get Keller on the line. Tafeen said he had just talked to him and knew how to get a hold of him, but the AOL representatives declined the offer. There was a discussion about the size of the deal, the revenue recognition problems from AOL's end, and whether the Homestyles deal should be included. Shew then addressed the fact that he had already confirmed that money had already gone to certain of the third party vendors and AOL had received the payments for the advertising. **The manner in which Shew explained how the money flowed left no doubt about the "round trip" nature of the subject transaction**, and neither Rindner nor Ripp denied knowledge of the structure as described by Shew. **Essentially, Shew told Rindner and Ripp in no uncertain terms that Homestore had fronted the money to the third party vendors** in order to solve AOL's revenue recognition issues, that Homestore knew AOL had received the money, and based on the way the deal was structured, AOL had no reason not to pay Homestore and complete the deal.

360. AOL sent in their confirmation of the deal that evening after the call ... If Wolff didn't already understand the nature of the deals, he had it explained to him "in no uncertain terms" during the June 29, 2001, telephone conference call.

Plaintiff makes numerous other allegations regarding Mr. Wolff that the Court will not detail here. The facts outlined above are sufficient to satisfy the stringent pleading requirements of the PSLRA. Relying on background contextual information, internal reports at Homestore, public statements made by Wolff, his personal involvement in deals that were later restated, as well as specific, detailed allegations regarding personal behind-the-scenes conversations, the plaintiff adequately puts forth facts that give rise to a strong inference of deliberate recklessness, if not intentional misconduct, on the part of defendant Wolff. In addition, because the plaintiff has alleged a primary violation of § 10(b), and because Mr. Wolff was a "control person" within the meaning of § 20(a), plaintiff has stated a claim under

§ 20(a). Wolff's motion to dismiss is therefore DENIED.

### 3. *David Rosenblatt*

■ Defendant Rosenblatt moves to dismiss the FACC on the ground that the facts alleged as to him do not establish deliberate recklessness as to any of Homestore's fraud. Mr. Rosenblatt principally argues that the FACC does not attribute any of the false or misleading statements to him, that the FACC does not allege sufficient facts establishing his knowledge of improper accounting practices, and that scienter cannot be inferred simply from his position within the company and his stock sales. The Court agrees, and the Complaint as to David Rosenblatt is DISMISSED WITHOUT PREJUDICE.

Plaintiff's allegations as to Mr. Rosenblatt are very thin and all too often conclusory. Plaintiff first relies on Mr. Rosenblatt's position as General Counsel of Homestore, stating that as such, he "played a key role in drafting and/or approving Homestore's public filings and was instrumental in developing and implementing the revenue deals which are the subject of the complaint." FACC ¶ 39. This statement itself is non-specific, and never appears to have been properly corroborated in the other allegations in the complaint.

Plaintiff also alleges that Rosenblatt "executed his 'own deals.'" FACC ¶ 462. Yet the only "deals" that are tied directly to Rosenblatt are the "Marriott" and "Champion Enterprises" deals, FACC ¶¶ 462, 463, neither of which is alleged to have been improper.

All other allegations as to Mr. Rosenblatt are similarly conclusory or non-specific—that he "was aware of and participated in the scheme to defraud," FACC ¶ 459, that he "participated in the negotiations and documentation of Homestore's transactions," FACC ¶ 460, and that he

"had an opportunity to see all legs of the transactions and knew that they were bogus." *Id.* Without more, these allegations do not achieve the requisite level of specificity as to the alleged wrongdoing.

Plaintiff's reliance on the group published doctrine with respect to Rosenblatt does not save it. Plaintiff has not pled with any specificity the nature of Mr. Rosenblatt's "participation in day-to-day activities" or that he had the requisite special relationship with the company. Being close to Tafeen and Wolff simply is not enough. Furthermore, plaintiff has not indicated which deceptive or misleading statements or acts fall within the doctrine.

Taken on the whole and in context, the allegations contained in the FACC are insufficient to establish the "strong inference" of deliberate recklessness as to any statement, act or scheme on Rosenblatt's part. Likewise, because no primary violation has been shown, and because plaintiff did not state in the FACC the primary violators over which Rosenblatt had "control," the FACC is insufficient to establish a claim for control person liability under § 20(a). Nevertheless, the Court finds that the most prudent course of action is to allow leave to amend, as the allegations against Mr. Rosenblatt, if properly supported in sufficient detail, would state a claim upon which relief could be granted. *Eminence Capital v. Aspeon, Inc.,* 316 F.3d 1048, 1052 (9th Cir.2003) (dismissal without leave to amend not appropriate unless clear that pleading could not be saved by amendment). Therefore, the FACC is DISMISSED WITHOUT PREJUDICE as to defendant Rosenblatt.

### 4. *Allan Merrill*

■ Defendant Allan Merrill moves to dismiss the Complaint on the ground that it does not plead sufficient factual allegations to support the required "strong infer-

ence" of deliberate recklessness of a false or misleading statement, act or scheme. The Court agrees, and the FACC is DISMISSED WITHOUT PREJUDICE as to him.

Plaintiff's allegations of securities fraud as to Mr. Merrill basically come down to his participation in one transaction involving the acquisition of "Homestyles." According to plaintiff's sources, Merrill was the "architect" of the $23 million deal. FACC ¶ 474. Plaintiff alleges that the deal was presented to Homestore's board of directors as a $15 million deal, but was later recorded in the minutes as a $23 million deal. *Id.* Plaintiff's sources believe that the board minutes were forged and that the remaining $8 million was used as part of a round trip transaction with AOL. *Id.* But plaintiff does not provide any corroborating details in support of this belief. Furthermore, there are no allegations to support the inference that Merrill acted with scienter when he negotiated and orchestrated the Homestyles deal.

All other allegations made as to Merrill do not tend to support an inference of deliberate recklessness, and often support the contrary inference. The Court first notes that Merrill only became a Homestore insider at the tail end of the Class Period, and is still an officer of Homestore. Next, plaintiff's allegations regarding the L90 triangular deal do not support a strong inference of scienter. Merrill was apparently peripherally involved in what appears to be an attempt at extortion by Mark Roah of L90. FACC ¶¶ 389–97. Roah allegedly tried to get Homestore to pay him $50–100,000 to provide confirmation of the deal consummated during the second and third quarters of FYE 2001. FACC ¶¶ 395–96. "Merrill told Shew that Homestore would not pay." FACC ¶ 395. If anything, this shows Merrill attempting to follow securities laws, not break them.

Other allegations regarding: 1) Merrill's role in the preparation and filing of Homestore's third quarter FYE 2001 financial statement, 2) Merrill's role in the "spin" on the company's downfall, and 3) Merrill's inability to formulate a response to an audit committee member's question about Homestore's accounting practices, all fail either for lack of specificity or because they simply do not support an inference of deliberate recklessness with respect to any allegedly false or misleading statement, act or scheme.

Plaintiff's reliance on the group published doctrine does not save its claims against Mr. Merrill. To begin with, Mr. Merrill could not possibly have been involved in the day-to-day affairs of the company for the vast majority of the class period, as he was not even an officer of the company. Further, plaintiff has not shown what statements or acts it asserts fall under the doctrine.

Taken as a whole and in the context of the entire complaint, the allegations stated in the FACC are not sufficient as to defendant Merrill. Likewise, because plaintiff has not succeeded in pleading a claim against Mr. Merrill as a primary violator, and because plaintiff has made no showing that Merrill had "control" over any primary violator, plaintiff's claim under § 20(a) must also fail. However, the Court finds that the most prudent course of action is to allow leave to amend, as the general allegations against defendant Merrill, if supported by sufficient facts in corroboration, may be sufficient to state a claim upon which relief can be granted. *Eminence Capital,* 316 F.3d at 1052. Therefore, the Court hereby DISMISSES WITHOUT PREJUDICE the Complaint as to defendant Merrill.

### 5. *Catherine Kwong Giffen*

The Court finds no substantiated claim against defendant Catherine Kwong

Giffen. The allegations against her are extraordinarily weak. The only allegation even worth mentioning is that Ms. Giffen sold stock while in possession of adverse non-public information, and that these sales constituted insider trading. As the Court has already found plaintiff's pleading insufficient as to stock sales in general, no further comment is necessary. Ms. Giffen's stock transactions were not "unusual or suspicious." There is therefore no allegation supporting scienter on her part. Neither her position within the company, Vice President of Human Resources, nor her personal relationship with Mr. Giescke can lead to any inference of deliberate recklessness.

Although the Court finds it doubtful that plaintiff will plead facts in sufficient detail as to Ms. Giffen, the most prudent action at this stage of the litigation is to allow leave to amend, as the general allegations against defendant Giffen, if supported by sufficient facts in corroboration, may be sufficient to state a claim upon which relief can be granted. The FACC is hereby DISMISSED WITHOUT PREJUDICE as to Ms. Giffen.

### 6. *Sophia Losh*

Sophia Losh was the Senior Vice President of the Strategic Alliances Group ("SAG") at Homestore. For whatever reason, Ms. Losh filed a joinder to the brief of non-analogous party, Cendant Corporation. The Court construes her joinder as a joinder to the general argument of insufficiency of the Complaint. The allegations against Ms. Losh are included in five brief paragraphs, FACC ¶¶ 480–484, and do not include sufficient factual detail to support a strong inference of scienter. However, with additional factual allegations concerning the alleged actions and role of Ms. Losh in the statements or material omissions of Homestore and the general scheme to defraud, the Court finds that plaintiff may be able to state a claim

against Ms. Losh. Therefore, Ms. Losh's motion to dismiss is hereby GRANTED with leave to amend, and the Complaint is DISMISSED WITHOUT PREJUDICE as to her.

### B. *Outsider Defendants—The "Business Partners" and "Third Party Vendors"*

Seventeen of the defendants presently before the Court are either business partners or third party vendors of Homestore, or employees and/or officers thereof. Those defendants vociferously deny liability for any wrongs in Homestore's transactions, accounting and disclosure procedures, claiming that *Central Bank* and its progeny bar actions against simple "business partners" as a matter of law. In support of this assertion, these defendants point out that most attempts to date to assert liability under the "scheme" prong of Rule 10b–5 have been rejected as equivalent to the "aider and abettor" liability disallowed by *Central Bank*. They further argue that significant participation in the creation or dissemination of "false or misleading *statements* " is required for liability under § 10(b) and Rule 10b–5. Plaintiff counters that the language of *Central Bank* itself allows for liability to run to secondary *actors*, so long as they have committed independent acts that constitute primary *violations* of Section 10(b) and Rule 10b–5. Plaintiff points to cases within this circuit that have allowed for liability under the "scheme" prong of Rule 10b–5, even after *Central Bank.*

Plaintiff's theory of liability as to the outside defendants is creative and plausible, yet it must fail for three reasons. First, the parties have not cited, and the Court is unaware of, any post-*Central Bank* case that has ever held that a simple business partner to a corporation is liable to the shareholders of that corporation for

securities fraud. The Court declines the invitation to be the first. Second, no matter how a "scheme" is defined, *Central Bank* dictates that only those participants who commit "primary violations" of the securities laws may be held liable; those who merely facilitate or participate cannot. Third, in this case, the shareholders of Homestore were damaged by their reliance on statements and material omissions made by Homestore, not the "scheme" itself. Plaintiff's "scheme to make an omission" theory is simply too attenuated to hold outside business partners liable under Section 10(b). Because the Court holds that *Central Bank* precludes liability for ordinary business partners and third party corporations doing business with the primary violator as a matter of law, the FACC is dismissed with prejudice as to those defendants.

### 1. The Scope of Securities Fraud Liability

Prior to *Central Bank*, the lower federal courts had nearly uniformly recognized an implied right of action for aiding and abetting liability under Section 10(b) and Rule 10b–5. The elements of the cause of action were as follows: 1) a primary violation by another person, 2) actual knowledge or reckless disregard by the aider and abettor of the wrong and his role in furthering it, and 3) substantial assistance by the defendant in the achievement of the primary violation. *See e.g. Levine v. Diamanthuset, Inc.,* 950 F.2d 1478, 1483 (9th Cir.1991). Under this cause of action, outside business entities that substantially participated in or assisted with the primary violation were routinely held liable for their aiding and abetting. *See e.g. id. Central Bank* eliminated this implied right of action. That decision also called into question the SEC's authority to bring civil enforcement actions against aiders and abettors. 3 A. Bromberg & L. Lowenfels, *Bromberg and Lowenfels on Securities Fraud and Commodities Fraud* 2ed, Sec. 8.5(610), p. 516.

When Congress was drafting the PSLRA the following year, the Supreme Court's holding and its effect on both private and SEC enforcement actions was a heavily discussed and debated topic. *Id.* In the end, Congress declined to create an express private right of action for aiding and abetting securities fraud, but expressly granted authority to the SEC to bring civil enforcement actions seeking damages and injunctive relief for aiders and abettors in enacting what is now Section 20(f) of the Securities Exchange Act. *Id.,* 15 U.S.C. § 78t(f)

Private litigants have since turned to the "scheme" prong of Rule 10b–5 in an attempt to reach outside defendants. *See e.g. Stack v. Lobo,* 903 F.Supp. 1361, 1374 (N.D.Cal.1995). While it is clear in some sense that one may be held liable for securities fraud for participation in a "scheme to defraud" even after *Central Bank, see Cooper v. Pickett,* 137 F.3d 616 (9th Cir. 1998), the Court is unaware of any case since *Central Bank* that has ever held that outside business partners, no matter how involved they were in fraudulent transactions with a corporation, can be held liable in a private action brought by the shareholders of that company. A brief survey of the case law in this circuit demonstrates this point.

First, courts have no trouble finding liability where the actor is a corporate insider, even when that actor claims not to have committed the actual fraudulent statement or act. *Cooper,* 137 F.3d at 624–25 (holding that a corporation that released a misleading report to an analyst who subsequently passed those statements on to the investing public can be held liable for specific acts in furtherance of a scheme to defraud); *Howard v. Everex Systems, Inc.,* 228 F.3d 1057 (9th Cir.2000) (CEO

who acted with requisite scienter in signing SEC filings could not escape liability simply because he did not participate in the drafting or editing of the statements). Second, persons "outside" a corporation have been held liable as primary violators in private actions brought by shareholders of that corporation if those persons substantially and directly participated in the creation of false or misleading statements to the investing public. *DSAM Global Value Fund v. Altris Software, Inc.*, 288 F.3d 385, 390 (9th Cir.2002) (auditor may be considered primary violator if sufficient facts pled); *McGann v. Ernst & Young*, 102 F.3d 390 (9th Cir.1996) (holding that *Central Bank* did not preclude finding of direct liability of accountant based on false information provided in audit); *In re Software Toolworks*, 50 F.3d 615, 628–29 (9th Cir.1994) (underwriter who played a significant role in the review, drafting and editing of letters sent to the SEC liable under Rule 10b–5); *In re ZZZZ Best Secs. Litig.*, 864 F.Supp. 960, 971 (C.D.Cal.1994) (outside accounting firm can be a primary violator for participation in reviewing statements publically released by the company). Thus in every post*Central Bank* case cited to the Court where an "outsider" has been held liable as a primary violator, that outsider had some type of special relationship with the corporation, i.e. accountant, auditor, etc.

Significantly, these are exactly the types of "secondary actors" the Supreme Court envisioned as potential "primary violators" in *Central Bank*. In holding that there is no "aider and abettor" liability under Section 10(b) of the Securities Exchange Act, the Court noted that:

> The absence of § 10(b) aiding and abetting liability does not mean that secondary actors in the securities markets are always free from liability under the securities Acts. Any person or entity, *including a lawyer, accountant, or bank*, who employs a manipulative device or makes a material misstatement (or omission) on which a purchaser or seller of securities relies may be liable as a primary violator under 10b–5, assuming all of the requirements for primary liability under Rule 10b–5 are met. In any complex securities fraud, moreover, there are likely to be multiple violators ...

*Central Bank*, 511 U.S. at 191, 114 S.Ct. 1439 (emphasis added). Yet the language of the Supreme Court does not suggest, and the subsequent case law does not support, the notion that a business partner with no special relationship with a corporation, let alone its shareholders, can be held liable for the material misstatements or omissions of that corporation or its officers, no matter how much it assisted or participated in transactions that led to that statement or omission. Such a holding would broaden the scope of the securities acts so as to haul into court anyone doing business with a publically traded company. The same policies behind the *Central Bank* decision apply equally here. This Court declines to broaden the scope of the securities acts any further, absent direction from Congress.

### 2. The "Scheme" and the "Primary Violator" Requirement

What defines a "scheme to defraud" is elusive and not well-examined in the case law. However, no matter what the definition of a "scheme" turns out to be, *Central Bank* requires that a plaintiff allege facts that show a primary violation of securities laws by each and every defendant.

Some of the defendants in the present case argue that the "scheme" prong of Rule 10b–5 is simply another name for "aiding and abetting," and is therefore no longer viable after Central Bank. *See* AOL Mot. at 7, *citing Stack v. Lobo*, 903 F.Supp. 1361, 1374 (N.D.Cal.1995). Yet the Ninth Circuit appears to have held that a person may be liable for partic-

ipation in a "scheme" even after *Central Bank*. In *Cooper v. Pickett*, 137 F.3d 616 (9th Cir.1998), a corporation made misleading statements to an analyst, who then made statements to the investing public based on those statements. *Id.* at 619. The corporation argued that it could not be held liable because it merely aided the fraudulent act. *Id.* at 624. The court rejected that argument because the corporation had committed its own independent fraudulent act. *Id.* The court specifically held that plaintiff's claim was not a "conspiracy" as a separate right of action, but rather was a claim of an independent act as part of a scheme to defraud. *Id.* "*Central Bank* does not preclude liability based on allegations that a group of defendants acted together to violate the securities laws, *as long as each defendant committed a manipulative or deceptive act in furtherance of the scheme.*" *Id.* (emphasis added). *Cooper* establishes that "scheme" and "aiding and abetting" are *not* equivalent. Unfortunately, the term "scheme" was not defined in any meaningful way. In addition, there is no indication that liability for participation in a scheme can extend beyond the corporate officers and those with a special relationship with the corporation.

What is clear, however, is that *Central Bank* requires a plaintiff to allege that each and every defendant committed its own independent primary violation of securities laws in order to state a claim. *Central Bank*, 511 U.S. at 191, 114 S.Ct. 1439. Rule 10b–5 makes it unlawful for any person "to employ any ... scheme ... to defraud ... in connection with any security." The Court resolves this apparent conflict by finding that of the many participants in a "scheme," there may be primary violators and secondary violators. Those who actually "employ" the scheme to defraud investors are primary violators, while those who merely participate in or facilitate the scheme are secondary violators. In the present case, the primary

architects of the scheme are the officers of Homestore who designed and carried out the schemes to defraud. The Court holds that other actors, such as AOL and its employees who actively participated in the triangular transaction scheme, did not "employ" the scheme to defraud investors, and are therefore secondary violators. Therefore, they are "aiders and abettors" within the meaning of *Central Bank*.

Based on the foregoing analysis, the Court holds that a "scheme" within the meaning of the Securities Exchange Act and the PSLRA involves one or more participants acting together to violate securities laws. Those participants may have differing degrees of culpability depending on their role in the scheme. In light of *Central Bank*, only those participants who are "primary violators" of Section 10(b) may be held liable in a private action for securities fraud.

### 3. The Requirement of a "Statement" or "Omission"

Somewhat independent of the *Central Bank* analysis, each of the outside business partners and third party vendors attacks the FACC for failing to identify any false or misleading statements or material omissions attributed to them as opposed to Homestore insiders or its auditor. Nor does the FACC allege in any detail that these defendants played any "significant role" in the drafting or editing of such statements. *In re Software Toolworks*, 50 F.3d 615, 628–29 (9th Cir.1994). So the question arises as to whether a statement or material omission is required on the part of the defendants in order for the plaintiffs to state a claim.

It is true that no "statement" is required to state a claim under Rule 10b–5, *in general.* For example, a person may be liable for a manipulative "act" or deceptive scheme that operates a fraud on another

with respect to the purchase or sale of a security. *SEC v. Zandford,* 535 U.S. 813, 122 S.Ct. 1899, 1903, 153 L.Ed.2d 1 (2002) (broker held liable for conversion of securities from elderly person). In addition, a person may be held liable under Rule 10b–5 for insider trading, which has been considered a deceptive "device." *No. 84 Employer–Teamster v. America West,* 320 F.3d at 937. However, in each of these examples, it was the act or device that actually causes the damage to the injured party.

In the present case, plaintiff suffered damage through its reliance on false or misleading statements, not from the "scheme" itself. Thus, the scheme is one step removed from the injured party. The scheme was not complete until the statement was made. Essentially what plaintiff alleges is a scheme to make a deceptive statement or material omission. Yet the principal "wrong" alleged under the rule is the statement, not the scheme. Therefore, it is appropriate to require defendants in this case to be connected in some material way to the drafting of the statements made to the investing public. Here, this means the SEC filings, the press releases, the oral statements of Homestore, and the supporting statements of its auditor, Pricewaterhouse Coopers. Because plaintiff did not (and cannot) sufficiently allege that any of the business partner or third party vendor defendants substantially contributed to those statements, it cannot state a claim against those defendants for damages resulting from reliance on statements or material omissions.

While this Court feels compelled to arrive at this result, it does so with reservation. The acts alleged in the FACC, which this Court must accept as true for purposes of this motion, describe a massive conspiracy driven by pure avarice. In particular, the detailed factual allegations describing the role of AOL and its agents in helping Homestore please Wall Street and in boosting its own revenues through bogus commissions give this Court great pause. Nevertheless, the role of AOL and the other business partner and third party vendor defendants appears to be exactly the role of aiders and abettors prior to *Central Bank,* and is exactly the role that *Central Bank* exempted from liability. This decision does not mean that the wrongs of these aiders and abettors will necessarily go unchecked; the PSLRA expressly granted the SEC the authority to bring civil actions against aiders and abettors of securities fraud, and it is this Court's understanding that some investigation is ongoing.

In sum, this Court declines to expand the scope of liability under Section 10(b) and Rule 10b–5 to include business partners of Homestore. No post-*Central Bank* case has ever held that such defendants are liable to the shareholders of a publicly-traded company. Their role in the alleged scheme to defraud investors by artificially inflating the price of Homestore's stock is one of an assistant, an aider or abettor, rather than a primary violator. In addition, plaintiff can point to no independent statements or material omissions of these defendants, nor has it alleged that they substantially contributed to the drafting of any of Homestore's misleading statements. For all of these reasons, the motions of the business partner and third party vendor defendants are GRANTED. The FACC is DISMISSED WITH PREJUDICE as to the following parties: AOL Time Warner, Eric Keller, David Colburn, Cendant Corporation, Richard Smith, L90, Akonix, CityRealty, Classmates Online, CornerHardware, Dorado Corporation, GlobeExplorer, Internet Pictures, PromiseMark, RevBox, SmartHome, and WizShop.

Because the Court finds that plaintiff's action under Section 10(b) (and therefore under Section 20(a)) is precluded as to these defendants as a matter of law, the Court does not address the sufficiency of the Complaint as to those parties.

### C. Auditor Defendant—Pricewaterhouse Coopers

It is well-established in the Ninth Circuit that an outside auditor of a publicly-held company can be held liable as a primary violator under Central Bank. *DSAM Global Value Fund v. Altris Software, Inc.*, 288 F.3d 385 (9th Cir.2002); *In re Software Toolworks, Inc.*, 50 F.3d 615 (9th Cir.1994). Therefore, Pricewaterhouse Coopers brings this motion to dismiss by challenging the sufficiency of the allegations in the complaint. The Court finds that plaintiff has pled facts sufficient to give rise to the requisite "strong inference" that PWC acted with "intent to defraud, conscious misconduct, or deliberate recklessness," as required by the PSLRA. *DSAM Global*, 288 F.3d at 390.

A plaintiff alleging a violation of Section 10(b) and Rule 10b–5 against an independent auditor such as PWC must satisfy the requirements of the PSLRA by alleging with specificity that "the accounting practices were so deficient that the audit amounted to no audit at all, or an egregious refusal to see the obvious, or to investigate the doubtful, or that the accounting judgments which were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts." *DSAM Global*, 288 F.3d at 390; *citing In re Worlds of Wonder Secs. Litig.*, 35 F.3d 1407, 1426–27 (9th Cir.1994).

From the outset, the Court notes that many of the same factual allegations that PWC touts as evidence of an auditor "doing its job" ironically also show scienter in the securities fraud context. The fact that PWC on many occasions "questioned" certain transactions and "objected" to others shows that the PWC's auditors knew of the questionable nature of Homestore's accounting. The fact that they let many of these transactions proceed demonstrates "an egregious refusal to see the obvious."

PWC relies heavily on two post-*Central Bank* auditor liability cases, *DSAM Global Value Fund v. Altris Software, Inc.*, 288 F.3d 385 (9th Cir.2002) and *In re Software Toolworks, Inc.*, 50 F.3d 615 (9th Cir.1994). The Court first examines this authority, then demonstrates how the plaintiff in the present case has pled substantially more than was pled against the auditor defendants in those two cases.

In *DSAM Global*, Pricewaterhouse Coopers certified that Altris Software, Inc.'s ("Altris") 1996 Form 10–K financial statement complied with Generally Accepted Accounting Principles ("GAAP") and that Pricewaterhouse Coopers had complied with Generally Accepted Auditing Standards ("GAAS"). 288 F.3d at 388. Altris then filed its financial statement with the SEC and included the audit certification, both affirming that the company had posted net income of $2.4 million for the year. *Id.* One year later, in preparing the 1997 audit, PWC discovered that the 1996 statement reflected revenue that should not have been recognized, and withdrew its audit opinion. *Id.* Altris then restated its revenues for 1996, reversing $4.9 million in previously recognized revenue, causing the company to post a net loss rather than a net profit for that year. *Id.*

Investors filed suit, in essence alleging that "Altris recognized revenue on software sales before critical requirements had been met, making its 1996 sales and earnings appear larger than they really were," and that PWC had "failed to take the necessary steps to test those sales to provide a reasonable basis for the audit

opinion it issued." *Id.* at 389. Specifically, plaintiffs asserted: 1) that PWC failed to recognize three accounting "red flags" regarding start up fees for software sales, and 2) that PWC had not followed the GAAS in auditing the recognition of revenue for software sales. *Id.* The alleged red flags were: "grossly exorbitant" fees charged by Altris, the timing of the recognition of the fees at the end of the year, and the fact that the contract documents described the transactions as special. *Id.* As to revenue recognition, plaintiffs alleges that PWC had failed to catch Altris' repeated violations of a GAAP, specifically the Software Revenue Recognition Statement of Position 91–1 ("SOP 91–1"), which only allows for software revenue recognition when seven specific conditions have been met. *Id.* Yet plaintiffs' primary allegation was that PWC must have been aware of improper revenue recognition simply because they were in possession of documents that clearly showed the violation. *Id.*

The court in *DSAM* rejected the plaintiffs' allegations as insufficient to state a claim under Section 10(b) and Rule 10b–5. The Court did not examine the relevance of the "red flags," but did state that mere possession of documents depicting improper revenue recognition was not enough to show scienter. *Id.* at 390. The court specifically found that the plaintiffs had "failed to allege any facts to establish that [PWC] knew or must have been aware of the improper revenue recognition, intentionally or knowingly falsified the financial statements, or that the audit was such an extreme departure from reasonable accounting practice that [PWC] knew or had to have known that its conclusions would mislead investors." *Id.* at 390–91.

Similarly in *Software Toolworks*, plaintiffs provided circumstantial evidence that the accountant in the case knew about or recklessly disregarded errors in the finan-

cial statements. 50 F.3d at 627. Specifically, plaintiffs alleged that sales agreements were "poorly documented, informal and conditional," that certain "licensing transactions were risky," that management was "under extraordinary pressure for favorable earnings," and that the accountant obtained only oral confirmations of some agreements. *Id.* However, the court detailed the steps that the accountant took in preparing its audit, and found that the allegations did not establish that the audit was reckless. *Id.* The court stated, "At most, the evidence establishes that [the accountant] was negligent in auditing [the company], not that [the accountant] recklessly or knowingly falsified the financial statements". *Id.* The plaintiffs had failed to show specific facts demonstrating the accountant's knowledge or state of mind when issuing its audit.

The case before the Court is factually distinguishable. The Complaint filed by the plaintiff describes an auditor that 1) was heavily involved in the day-to-day accounting practices of the company, 2) had actual knowledge of specific improper transactions and the accounting thereof, 3) even objected to some of these transactions but not to identical transactions, and 4) nonetheless issued an unqualified audit opinion certifying that Homestore's publicly filed financial statements complied with the GAAP and that its auditing complied with the GAAS. More than with any other defendant in this action, plaintiff establishes a strong inference that PWC acted with deliberate indifference, if not conscious misconduct, when it refused to see the obvious, or to investigate the doubtful, improper transactions and revenue recognition carried out by Homestore and its officers. The FACC alleges scienter through so many examples that the Court will not detail each and every one here. The following are a few of the more signifi-

cant allegations giving rise to the inference of scienter.

First, the Court begins with the fact that this is a restatement case. Under GAAP, the restatement of previously issued financial statements is reserved for circumstances where no lesser remedy is available. In conjunction with Homestore's FYE 2000 SEC filing and annual report to its shareholders, PWC issued an unqualified audit report that stated: "In our opinion, this financial statement presents fairly, in all material respects, the information set forth therein when read in conjunction with the related consolidated financial statements." FACC ¶ 649. In March of 2002, however, Homestore restated *seven quarters* of revenue. FACC ¶¶ 655, 657. Unlike the defendant in *DSAM* where the restatement involved a total of $4.9 million, Homestore restated a total of $193 million in revenue, constituting 52.8% of all advertising revenue and 22.8% of total revenue for that time period. FACC ¶¶ 654–57. This evidences an accounting and auditing debacle amounting to more than gross negligence.

Next, plaintiff details several accounting "red flags" (known as "risk factors" in the GAAS, AU §§ 316.16–316.17) that PWC was confronted with and to which it did not react or respond. The most significant of these red flags was the fact that on numerous occasions, major transactions took place within the last few days of the quarter. *See generally* FACC ¶ 578; *see also, e.g.* FACC ¶¶ 331–339, 359–360, 618. Unlike the transactions that are described in *DSAM* that occurred once at the end of the year, the transactions detailed in the FACC repeatedly occurred at the end of the quarter. Another red flag occurs when management sets unduly aggressive financial targets and expectations for operating personnel. Plaintiff has alleged this in detail, and the Court must accept its allegations as true for purposes of this motion. FACC ¶¶ 578, 328, 347, 439, 585. The FACC details several other risk factors not discussed here that were ignored by PWC. FACC ¶¶ 537–34.

Plaintiff also details various GAAP provisions that Homestore violated that were not recognized in PWC's audit, as well as the GAAS provisions PWC violated in performing this defective audit. First and foremost, one of the principal issues in the late 1990s was how to properly account for "barter-type" transactions. In January 2000, at the beginning of the class period, the Financial Accounting Standards Board made effective "Emerging Issues Task Force ("EITF") Issue No. 99–17," entitled "Accounting for Advertising Barter Transactions." FACC ¶ 545. Such transactions could only be recorded if the fair value of the advertising surrendered in the transaction could be determined based on the company's own historical practices of receiving cash or cash equivalents for similar advertising sold to unrelated entities. FACC ¶ 546. Similarly, EITF 99–19, also effective prior to the class period, dealt with recognition of gross revenues versus net. FACC ¶ 550–551. Many of Homestore's reciprocal "barter-type" transactions were alleged to have violated both of these rules. FACC ¶ 148–152, 607–611. Interestingly, PWC required some of these transactions to be netted, while it allowed others to be reported as gross. *Id.* and 612–623. PWC also did not always require the proper valuation for advertising. *Id.* The Court draws the logical inference that because PWC objected to some transactions, it knew that the transactions and the accounting of them were improper. The fact that it also allowed some of them to be reported as gross without proper valuation shows that PWC acted with deliberate recklessness in failing to properly audit Homestore's transactions and accounting practices.

The Court also notes that such allegations are explained in sufficient detail. For example, paragraph 628 explains that the issue of gross versus net accounting under EITF 99–19 was discussed in detail at a Homestore Audit Committee meeting at which PWC's Withey was present. "Whithey did not object to [past] booking on a gross basis, but ... in light of the concerns expressed, the use of the gross proceeds would not be allowed again ... [this decision] allowed the gross revenues of a fraudulent transaction to be booked in the first quarter of 2001." FACC ¶ 628. Thus this is not a case like *DSAM,* where the Court found absolutely no factual allegations showing that the auditor in that case knew anything or acted with reckless disregard.

The Court hereby finds that the FACC sufficiently alleges facts that give rise to the requisite "strong inference" that PWC acted with deliberate recklessness when it issued its audit opinion for Homestore's FYE 2000 statements to the SEC and the shareholders, and for its substantial participation in the preparation of various quarterly reports. Pricewaterhouse Coopers' motion to dismiss is hereby DENIED.

## CONCLUSION

Having considered the pleadings and papers filed by the parties, and having heard oral argument on the issues, the Court rules as follows based on the foregoing analysis:

1) The motions of the following defendants are hereby DENIED: Stuart H. Wolff (Dkt. No. 126), Pricewaterhouse Coopers, (Dkt. No. 185);

2) The motions of the following defendants are GRANTED, and the complaint as to such defendants is DISMISSED WITHOUT PREJUDICE: David Rosenblatt (Dkt. No. 116), Al-lan Merrill (Dkt. No. 104), Catherine Kwong Giffen (Dkt. No. 204), Sophia Losh (Dkt. No. 117);

3) The motions of the following defendants are GRANTED, and the complaint as to such defendants is DISMISSED WITH PREJUDICE: AOL Time Warner (Dkt. No. 122), Eric Keller (Dkt. No. 203), David Colburn (Dkt. No. 111), Cendant Corporation (Dkt. No. 202), Richard Smith (Dkt. No. 202), L90 (Dkt. No. 205), Akonix (Dkt.Nos.108–109), CityRealty (Dkt. Nos. 108, 113), Classmates Online (Dkt. No. 110), Corner-Hardware (Dkt. No. 108), Dorado Corporation (Dkt. No. 108), GlobeExplorer (Dkt. No. 100), Internet Pictures (Dkt. No. 108), PromiseMark (Dkt. No. 108), RevBox (Dkt. No. 108), SmartHome (Dkt. No. 108), and WizShop (Dkt. No. 153).

This order does not include or cover named defendants Privista, Inc, Top Producer Systems, Inc., or Jeff Kalina. Privista's Motion to Dismiss (Dkt. No. 209) was filed on February 24, 2003, and therefore will be noted for consideration on March 21, 2003, unless agreed otherwise by the parties.

The Clerk is directed to send a copy of this order to all counsel of record.